No. 17-4125

# In the
# United States Court of Appeals
# for the Sixth Circuit

WALID JAMMAL; KATHLEEN TUERSLEY; CINDA J. DURACHINSKY; NATHAN GARRETT,

*Plaintiffs-Appellees,*

v.

AMERICAN FAMILY INSURANCE COMPANY; AMERICAN FAMILY MUTUAL INSURANCE COMPANY; AMERICAN FAMILY LIFE INSURANCE COMPANY; AMERICAN STANDARD INSURANCE COMPANY OF WISCONSIN; AMERICAN FAMILY TERMINATION BENEFITS PLAN; RETIREMENT PLAN FOR EMPLOYEES OF AMERICAN FAMILY INSURANCE GROUP; AMERICAN FAMILY 401K PLAN; GROUP LIFE PLAN; GROUP HEALTH PLAN; GROUP DENTAL PLAN; LONG TERM DISABILITY PLAN; AMERICAN FAMILY INSURANCE GROUP MASTER RETIREMENT TRUST; 401K PLAN ADMINISTRATIVE COMMITTEE; COMMITTEE OF EMPLOYEES AND DISTRICT MANAGER RETIREMENT PLAN,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland, No. 1:13-cv-00437.
The Honorable **Donald C. Nugent**, Judge Presiding.

## BRIEF OF PLAINTIFFS-APPELLEES
## WALID JAMMAL, KATHLEEN TUERSLEY, CINDA J. DURACHINSKY and NATHAN GARRETT

CHARLES J. CRUEGER
ERIN K. DICKINSON
CRUEGER DICKINSON LLC
4532 North Oakland Avenue
Whitefish Bay, WI 53211
(414) 273-8474

GREGORY F. COLEMAN
GREG COLEMAN LAW PC
First Tennessee Plaza
800 South Gay Street
Suite 1100
Knoxville, TN 37929
(865) 247-0080

EDWARD A. WALLACE
KARA A. ELGERSMA
WEXLER WALLACE LLP
55 West Monroe Street
Suite 3300
Chicago, Illinois 60603
(312) 346-2222

*Counsel for Plaintiffs-Appellees*

COUNSEL PRESS · (866) 703-9373 PRINTED ON RECYCLED PAPER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........ vi

INTRODUCTION ........ 1

STATEMENT OF THE ISSUE ........ 4

PROCEDURAL HISTORY ........ 5

STATEMENT OF THE CASE ........ 6

I. The district court's findings of fact. ........ 6

A. American Family's right to control is a company-wide policy. ........ 8

B. The district court rejected American Family's factual disputes about its company-wide policy as contradicted by the evidence. ........ 12

C. American Family has the right to control the manner and means of the agents' service because it owns the books of business. ........ 14

1. American Family requires agents to do personal insurance reviews and file daily activity reports. ........ 18

2. American Family requires agents to do other sales activities. ........ 20

D. American Family controls the agents' job opportunities. ........ 21

E. American Family controls other aspects of its agents' work. ........ 22

II. The district court's legal analysis focuses on American Family's right to control the manner and means of the agents' service. ........ 24

SUMMARY OF THE ARGUMENT ........ 26

ARGUMENT ........ 30

I. Standard of Review: The Court accepts the district court's findings of fact as true and disregards American Family's disputes about them. ........ 30

II. The district court applied the proper legal standard. ........ 33

A. *Darden's* test in ERISA cases focuses on the right to control the manner and means of the agents' service in reality. ........ 33

B. American Family's right to control distinguishes this case from precedent. ........ 37

C. American Family's structure of the relationship argument invites abuse. ....40

III. American Family agrees that a right to control manner and means shows employee status. It just disputes the findings of fact on this issue. ....42

IV. Other *Darden* factors support the district court's conclusion. ....45

A. American Family intends to treat the agents as employees. ....45

B. The skill required reflects employee status. ....46

C. The right to assign additional projects and control over when and how long to work reflect employee status. ....47

D. American Family leverages the duration of the relationship, and that the agents' work *is* American Family's business, to control the agents' job performance. ....50

E. American Family's right to fire and hire agency employees renders that factor neutral. ....52

V. The remaining factors are contractual in nature and cannot outweigh reality and American Family's right to control. ....53

VI. The district court never relied on so-called representative evidence as proof of a company-wide policy to retain the right to control. ....55

A. The district court identified a common policy applicable to all agents and did not rely on representative evidence. ....55

B. The district court resolved conflicting testimony. ....56

C. It is the right to control, not its exercise, that determines an employee relationship. ....57

CONCLUSION ....58

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Absolute Roofing & Constr. v. Sec'y of Labor*,
580 F. App'x 357 (6th Cir. 2014)....................50, 53

*Am. Family Mut. Ins. Co. v. Hollander*,
705 F.3d 339 (8th Cir. 2013)....................4, 41

*Arthur L. Christoffersen Irrevocable Tr. v. Yellow Book USA*,
536 F.3d 947 (8th Cir. 2008)....................41

*Aymes v. Bonelli*,
980 F.2d 857 (2d Cir. 1992)....................46

*Berger Transfer & Storage v. Cent. States Pension Fund*,
85 F.3d 1374 (8th Cir. 1996)....................30

*Bronk v. Mountain States Telephone & Telegraph, Inc.*,
140 F.3d 1335 (10th Cir. 1998)....................54

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989)....................33, 36

*First Liberty Inv. Grp. v. Nicholsberg*,
145 F.3d 647 (3d Cir. 1998)....................36

*Foster Wheeler Energy Corp. v. Metro. Know Solid Waste Auth., Inc.*,
970 F.2d 199 (6th Cir. 1992)....................3

*Keller v. Miri Microsystems LLC*,
781 F.3d 799 (6th Cir. 2015)....................50

*Kramer v. Cash Link Sys.*,
715 F.3d 1082 (8th Cir. 2013)....................41

*Marie v. Am. Red Cross*,
771 F.3d 344 (6th Cir. 2014)....................25, 35, 47, 50

*Miller v. Component Homes, Inc.*,
356 N.W.2d 213 (Iowa 1984)....................41

*Monroe v. FTS USA, LLC*,
860 F.3d 389 (6th Cir. 2017)....................56

*Moore v. Lafayette Life Ins. Co.*,
458 F.3d 416 (6th Cir. 2006)....................39

*N.L.R.B. v. Cement Transp., Inc.*,
490 F.2d 1024 (6th Cir. 1974)....................34, 57

*Nationwide Mut. Ins. Co. v. Darden*,
503 U.S. 318 (1992)....................*passim*

*Oestman v. Nat'l Farmers Union Ins. Co.*,
958 F.2d 303 (10th Cir. 1992)....................39

*Peno Trucking, Inc. v. C.I.R.*,
296 F. App'x 449 (6th Cir. 2008)....................34, 57, 58

*Plazzo v. Nationwide Mut. Ins. Co.*,
892 F.2d 79 (6th Cir. 1989)....................38

*Rumpke v. Rumpke Container Serv.*,
240 F. Supp. 2d 768 (S.D. Ohio 2002)....................47

*Schwieger v. Farm Bureau Ins. Co.*,
207 F.3d 480 (8th Cir. 2000)....................39, 52, 53, 54

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*,
642 F.3d 518 (6th Cir. 2011)....................30, 32, 36

*Trs. of the Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*,
395 F.3d 244 (6th Cir. 2005)....................27, 30, 35

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)....................56

*Union Sec. Ins. Co. v. Blakeley*,
636 F.3d 275 (6th Cir. 2011)....................30

*Ware v. United States*,
67 F.3d 574 (6th Cir. 1995)....................3, 37, 38, 51

*Waxman v. Luna*,
881 F.2d 237 (6th Cir. 1989)....................30

*Weary v. Cochran*,
377 F.3d 522 (6th Cir. 2004)....................*passim*

*Wilks v. Pep Boys*,
278 F. App'x 488 (6th Cir. 2008)............................................ 26, 31, 32, 43

*Wolcott v. Nationwide Mut. Ins. Co.*,
884 F.2d 245 (6th Cir. 1989)..................................................................3, 38

*Worth v. Tyer*,
276 F.3d 249 (7th Cir. 2001)......................................................................46

**Statutes & Other Authorities:**

American Family's Rule 30(b)(6) ...................................................................10, 29

Robert Wood, LEGAL GUIDE TO INDEPENDENT CONTRACTOR STATUS,
4 (Tax Institute, 2010).......................................................................46, 52, 58

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

After thoroughly examining American Family's conduct, internal policies, and real-world treatment of its agents, the district court found that in none of the cases from this and other courts did a company retain of the same level and breadth of control over its insurance agents as American Family does in this case. American Family's arguments and characterization of the district court's opinion seek to change the Supreme Court's common-law test for an employee in this Circuit and erase any meaningful distinction between employees and independent contractors. Accordingly, Plaintiffs-Appellees respectfully submit that oral argument will aid the Court's decision process.

## INTRODUCTION

Despite American Family's and the *amici's* efforts to portray the facts of this case as fitting comfortably within those cases finding that insurance agents are independent contractors, they do not. The facts the district court found based upon reliable and preponderant evidence put this case far outside the boundaries that this and other courts have found to support independent contractor status for insurance agents. American Family's one-sided policies and real-life treatment of its agents establish it as the outlier in the insurance agency context and beyond. To endorse its conduct would be a disservice to American Family's agents and would give the Company an unfair advantage over its competitors and all others who follow the law on independent contractor status.

Unlike any other case, American Family owns its agents' books of business and, to ensure that its books produce the revenue that it desires, it keeps the right to exercise rigid control over how the agents solicit and service insurance policies and regularly exercises that right to drive results. Unlike any other case, former management, including a former officer, testified that American Family purposefully misclassified its agents as independent contractors, and misled them, to save costs. And, unlike any other case, for years American Family committed to writing its policy requiring agents to comply with its instructions on soliciting and servicing insurance policies. American Family calls its agents independent

contractors, but in reality it retains and regularly exercises control over the agents' manner and means of selling and servicing policies.

These facts, and many others the district court found after trial, make the agents employees. The Supreme Court has held that the touchstone of the common-law test for an insurance agent in an ERISA case is the hiring party's right to control the manner and means of the agent's service. Ignoring this, American Family argues that the law in this Circuit is different for insurance agents, and even tries elevating its argument to something akin to doctrine, by claiming that in the "insurance context" this Court focuses on so-called "structural factors." But "structural factors" is just a phrase American Family made-up to argue that courts give more weight to how companies describe the relationship in a contract than what companies do in practice – a position this and other courts consistently reject.

Instead of "structural factors," this Court has held in the context of an insurance agent that "[t]he crux of *Darden*'s common law agency test is 'the hiring party's right to control the manner and means by which the product is accomplished.'" *Weary v. Cochran*, 377 F.3d 522, 525 (6th Cir. 2004) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)). In each case, this Court has decided that insurance agents were independent contractors because there was no evidence that the company had – much less exercised – the right to

control the agent's manner and means of selling and servicing policies. *See id* at 526; *Ware v. United States*, 67 F.3d 574 (6th Cir. 1995); *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245 (6th Cir. 1989). The facts the district court found here are dramatically different. The district court correctly applied the law when it concluded that American Family's right to control makes the agents employees.

American Family dislikes and disputes the findings of fact, arguing that it controls only the agents' goals and objectives. This and other factual conclusions that American Family urges here are conclusions that the trier of fact – a unanimous advisory jury and then the district court – plainly rejected. In any case, the employee-independent contractor issue is a mixed question of law and fact, and "[o]n interlocutory appeal the appellate court has no authority to review disputed questions of fact," and must accept them as true. *Foster Wheeler Energy Corp. v. Metro. Know Solid Waste Auth., Inc.*, 970 F.2d 199, 202 (6th Cir. 1992).

Importantly, despite the "end of the world" scenarios painted by American Family and the *amici* if the agents are employees, requiring American Family to follow the law that all other companies follow will not disrupt the insurance industry. American Family and its *amici* conjure a parade-of-horribles that allegedly will befall the insurance industry if this Court affirms, including "unpredictability," disruption of the equilibrium between companies and agents, and even diminishment of the agents' entrepreneurial incentives. This is all a

speculative smoke screen to mask the simple truth that American Family's conduct is *far* outside the contours of independent contractor law. The answer to American Family's protestations is simple: follow the law, as so many companies do. To bless American Family's characterization of the district court's opinion would erase well-established boundaries of employee-independent contractor law and allow companies to write one thing into a contract to shift the costs to the worker, and then practice something entirely different in reality.

A final word in response to American Family's, and its *amici's*, portrayal of the district court's findings in this case as an outlier: not only do cases regularly find that companies have stepped over the independent contractor line and treated their workers like employees, but American Family itself has been called for exactly this trespass. Not once but twice, American Family agents have been found to be employees. R.332-18, IRS TAM, PageID24834; *Am. Family Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 352 (8th Cir. 2013). By affirming, this Court, far from creating "dangerous precedent," can end American Family's continued trespass that harms the agents and gives it an unfair advantage over law-abiding companies.

The Court should affirm and remand the case for further proceedings.

## STATEMENT OF THE ISSUE

The baseline common-law test for determining employee/independent contractor status is the hiring party's right to control the manner and means of the

workers' service. Did the district court err in concluding that American Family's agents are employees based on its findings of fact that the Company has the right to control the manner and means of its agents' services and regularly exercises that right through its management of the agents?

## PROCEDURAL HISTORY

Plaintiffs-Appellees allege that, because American Family treats them and the certified Class as employees, their pension plan is subject to and violates the Employee Retirement Income Security Act (ERISA). The agents' pension plan is uninsured and unfunded, and it fails to satisfy ERISA's minimum protections on basic issues like vesting, accrual, and the non-forfeitability of accrued benefits. *See* R.67, Second Amended Complaint, PageID3076-80. The ERISA claims seek benefits due under their pension plan, as reformed to comply with ERISA, and remedies for American Family's breach of fiduciary duty.

The district court denied American Family's motion to dismiss and successive summary judgment motions to avoid a trial on the merits. R.42, Order; R.114, Opinion; and R.132, Opinion. It also granted Plaintiffs' class certification motion. R.137. American Family twice asked this Court to review the certification order. This Court denied both petitions. Case 16-305, Dkt.13-2; Case 17-308, Dkt.15-2.

The district court then held a twelve-day trial before an advisory jury on the misclassification issue. R.320, Findings, PageID20946. Twenty-eight witnesses and 262 exhibits were presented. After being instructed on the law, a unanimous jury found that Plaintiffs and the Class members were employees. *Id.*, PageID20984. After briefing, the district court issued findings of fact and law concluding that Plaintiffs and the Class were employees under ERISA. The district court also authorized American Family to appeal that order before it decided the ERISA issues. *Id.*, PageID20985-86. This Court granted American Family's petition for interlocutory appeal. Case 17-307, Dkt.20-2.

## STATEMENT OF THE CASE

### I. The district court's findings of fact.

American Family inaccurately portrays the district court's findings as "inconclusive," claiming that the district court based its conclusion on only "a handful" of facts that "slightly favored" employee status. Br.2, 13, 16. In reality, the district court found that the many facts favoring employee status far outweighed those facts favoring independent contractor status, and thus Plaintiffs proved their case by a preponderance of the evidence. R.320, Findings, PageID20984. Indeed, the district court made express findings of fact about American Family's right to control the agents' manner and means of soliciting and servicing insurance policies, such as:

- American Family, not the agents, owns the book of business, "could and did unilaterally reassign policies brought in by one agent, to other agents," and "could require agents to service policies that they did not initiate [sell] without compensation." *Id.*, PageID20982.
- American Family's "internal documents including the District Managers Manual and other training manuals indicate that American Family expected its sales managers to exercise control over agents' *methods* and *manner* of performing their services." *Id.*, PageID20972 (emphasis added).
- American Family never instructs its managers "to treat agents as independent contractors." *Id.*, PageID20983.
- Instead, "American Family trained its managers to exercise control over the *means* and *manner* of agents' sales and service duties when the company deemed it necessary, and reprimanded managers who did not exercise such control when the Company deemed it beneficial to do so." *Id.*, PageID20985 (emphasis added).
- American Family trains managers "to treat agents in the same manner as they would treat employees," and "to believe that they were the agents' bosses and had the authority to demand compliance from agents whenever an agent disagreed with them." *Id.*, PageID20983.

- "American Family managers, consistent with their training, acted as if they had the right to control the *manner* and *means* by which their agents sold and serviced insurance policies." *Id.*, PageID20984.

**A. American Family's right to control is a company-wide policy.**

The trial record also contradicts American Family's claims that the district court's findings of fact about its right to control rely on the testimony of only a "handful of agents and managers." Br.14. To the contrary, the district court primarily relied on American Family's internal documents and corroborating testimony by Company and other witnesses having decades of experience at American Family. R.320, Findings, PageID20969-70.

For example, going back as far as 1977, American Family has taught its managers "that to be effective a Manager cannot permit any deviation from what it takes to succeed," and "[i]n short your instructions must be followed." R.330-1, Exhibit, PageID23638. This manual's author managed agents at American Family from 1970s until 2003 and testified that American Family's position was the agents are "independent contractors for IRS purposes only." R.305, Transcript, PageID18706, 18714. Another former manager testified that American Family gave him a "manual that was very similar to this" for manager training. R.305, Transcript, PageID18786. Other witnesses confirmed that American Family used these manuals for "decades." R.320, Findings, PageID20970.

Starting in at least 2007, American Family sales management manuals "refer to agents as 'employees.'" *Id.*, PageID20983. *See also* R.326-10, Manual. These American Family manuals never distinguish between managing independent contractors and employees. R.326-10, Manual; R.306, Transcript, PageID19055. In fact, American Family produced no manuals teaching managers how to manage the agents as independent contractors, and the district court expressly found that American Family never instructed its managers to treat the agents as independent contractors. R.320, Findings, PageID20983.

In 2010, American Family developed sales manuals it distributed company-wide to teach all of its managers how to "achieve and exceed agent, district, state, and corporate goals." R.332-7, Exhibit, PageID24626. American Family's manuals state that if agents disagree with their instructions, sales managers can "take off your coaching hat, put on the manager hat, and require compliance," by telling the agent "Here is how I would like you to proceed," or "I would like you to do this with a good attitude to maximize chances for success." *Id.*, PageID24658. American Family even summarized its right to control in a "coaching continuum" stating that it may "control agents" through "coaching by telling":




*Id.*, PageID24667.

Other American Family documents contain similar or identical statements that it can control the agents as necessary to drive agent production. *See e.g.* R.329-20, Exhibit, PageID23434; R.330-3, Exhibit, PageID24135. American Family's Rule 30(b)(6) designee, who also managed American Family agents, confirmed that the Company prepared, reviewed, and approved every page of these documents, and it would have corrected anything that was inaccurate or inappropriate. R.320, Findings, PageID20970. *See also* R.309, Transcript, PageID19788-89.

American Family reaffirmed its policy in 2014 in a document on how to increase agent sales that it distributed to all of its sales managers. R.327-17, Email; R.327-18, Exhibit. In this document, American Family states again that "if the agent does not agree" with their instructions, the managers can change "to a manger role, and require compliance." R.327-18, Exhibit, PageID21896. A senior manager admitted that this is correct: "yes, you can do this…." R.306, Transcript, PageID19166. American Family also told managers that while "'forc[ing]' the

issue" with agents was "not ideal," it was appropriate "[a]fter coaching without seeing improvement," "if the agent has really tried to figure out the problem, but cannot identify the obstacle or solution," in "urgent or critically important situations," or "when you are in an evaluation or disciplinary mode (not coaching mode)." R.327-18, Exhibit, PageID21895, PageID21898. A video accompanying this manual shows American Family teaching its managers in a classroom setting that they are the "boss" and "[s]ometimes you do have to pull rank, but you want to pull it as a last resort versus leading with it." R.309, Transcript, PageID19686-87.

American Family documents and testimony also established that it used a formal performance improvement process to correct agent performance and behavior. R.326-8, Exhibit; R.320-10, Exhibit; R.329-13, Exhibit; R.306, Transcript, PageID19045-46. American Family's performance improvement process for its agents is indistinguishable from the performance improvement process it uses for employees, including using identical forms. R.326-7, Exhibit; R.326-8, Exhibit; R.306, Transcript, PageID19045-46; R.306, Transcript, PageID19009-12.

Further, both a current American Family officer and a current employee testified that American Family walled-off its human resources function, the experts in misclassification, from any oversight over or involvement with how the agents are managed. R.305, Transcript, PageID18898-902; R.306, Transcript,

PageID18981-82. When human resources performed its oversight role and reviewed how American Family treated its other non-employee temporary workers – called contingent labor – it concluded that the Company tended to "treat them as employees." R.329-9, Exhibit, PageID23164; R.306, Transcript, PageID18989-90. So human resources developed written policies and oversight to ensure that the Company manages its other non-employee contingent workers correctly and avoids misclassification issues. R.329-22, Policy; R.306, Transcript, PageID18991-92. This included barring the use of a performance improvement process with contingent labor, because it is "inconsistent with the classification" as non-employee workers. R.306, Transcript, PageID19025. Yet when it comes to the agents, American Family instructs human resources to never review whether the independent contractor classification is correct or develop policies to ensure that the agents are managed as independent contractors. R.305, Transcript, PageID18898-901. American Family's policy is to have no policy interfering with it treating the agents as employees.

### B. The district court rejected American Family's factual disputes about its company-wide policy as contradicted by the evidence.

At trial, American Family tried distancing itself from its company-wide policy documents demonstrating its right to control its agents by having its witnesses claim that the repeated statements in its documents were a mistake. R.320, Findings, PageID20970. The district court disagreed and made findings of

fact that "[t]he manuals and training methods were reviewed and approved by the Company." *Id.*, PageID20983. "They were not mistakes or aberrations, but documented the approach American Family wanted their managers to take when managing agents." *Id.* American Family's testimony disputing its policy "was contradicted by" other evidence establishing that "these techniques and instructions were taught to every manager in training courses," "were reinforced by" American Family upper management, and "were consistently used by American Family managers." *Id*., PageID20970. American Family "verified" and "approved" these manuals and they are "*universal* and *constant* policies at American Family…." *Id.* (emphasis added).

What is more, a former American Family officer with over 30-years of experience at the Company, Ralph Kaye, testified that American Family "considered the agents to be independent contractors for IRS purposes only," and that "he and other American Family senior management misled the agents by telling them they would be independent contractors for all purposes." *Id.*, PageID20970-71. The district court found that this testimony "was corroborated by other high-level managers." *Id.*, PageID20971, PageID20983. Not only did Kaye testify that American Family had the right to tell the agents "what to do, how to do it and when it should be done," but he explained that:

> I know firsthand what the differences [between what American Family said and what it did] are, and I felt guilty. I signed hundreds of

> contracts, and probably some of them are still out there, that I didn't tell the truth. They—I misrepresented myself as—as a company person. And I feel badly about it. I know I hurt a lot of people and that's why I am here.

R.305, Transcript, PageID18873; PageID18879.

Kaye also testified that when he raised the agents' misclassification with his superiors, "he was ignored and told to drop it." R.320, Findings, PageID20970.

### C. American Family has the right to control the manner and means of the agents' service because it owns the books of business.

The district court found that, consistent with its company-wide policy, American Family does more than set goals and objectives and monitor progress; it is "generally very involved in the day-to-day activities of their agents." *Id.*, PageID20972. American Family "closely supervised" the agents and has "the final say over agents' business plan, including productivity goals and *means* of *achieving* them." *Id.*, PageID20972, PageID20977 (emphasis added). "When an agent met American Family standards and employed American Family *techniques*, this control was not exercised. However, if the agent did not agree with or follow American Family directives and suggestions, control would be exercised by most managers in the form of reprimands, threats, and potential termination." *Id.*, PageID20982 (emphasis added). Thus, "although the retention and exercise of control of the *means* and *manner* of the agents' service was not technically allowed under the terms of the Agency Agreement, American Family did expect its

managers to exercise *such control* [referring to the means and manner of the agents' service] whenever necessary to achieve compliance with Company goals and standards." *Id.*, PageID20985 (emphasis added).[1] American Family expected managers to exercise control because it "trained its managers to exercise control over the means and manner of agents' sales and service duties…." *Id.*

What is more, American Family does not hire experienced agents with established agencies. Instead, American Family's policy is to hire as agents inexperienced people without "specialized knowledge or expertise"; a license to sell insurance is not required to be hired. *Id.*, PageID20949-50. It puts all new agents through a mandatory two-to-three month "comprehensive training program" to teach them "everything they needed to know to become licensed" and the "'American Family' way" of doing business, including "how to sell and how to operate an agency." *Id.*, PageID20950, PageID20973.[2] It then assigns each agent to a district, a geographic territory, and each agent "must report to an Agency Sales Manager." *Id.*, PageID20960-61. Agency Sales Managers report to their own

[1] American Family selectively edits this quote to argue that the district court "fixated on the notion that managers exercised control 'to achieve compliance with Company goals and standards.'" Br.31. As the full quote makes clear, the district court is referring to control over "the means and manner of the agents' service."

[2] Contrary to what American Family's states, none of the Plaintiffs had experience selling insurance before being hired. R.307, Transcript, PageID19206, PageID19372; R.309, Transcript, PageID19805.

managers, who in turn report to their own bosses, all of whom report to the Chief Sales Officer. *Id.*, PageID20961.

As the following chart reflects, this top-down hierarchy exists "to ensure that agents sell the mix of business American Family prefers to sell, and that they interact with customers in the way American Family wants them to interact":




*Id.*, PageID20961-62.

To that end, American Family sets sales goals for each manager and evaluates them on how they "drive agent production" to meet those sales goals. *Id. See also* R.328-4; R.312, Transcript, PageID20573-75. An excerpt from American Family's evaluation of a manager's performance that was admitted into evidence is reproduced below (R.328-4):

**Drive Agent Production** Rating: On Target

| Measure | Source of Target | Target | District Actual | Achieved |
|---|---|---|---|---|
| Net New Business Apps | District Plan | 5,376 | 5,280 | 98% |
| % of Commercial Farm Ranch Apps vs. All Line Apps or | State Average | 4.33% | 3.60% | no |
| [illegible] | [illegible] | [illegible] | [illegible] | |

American Family also ties the managers' pay to their agents' performance. R.331-3, Exhibit; R.321, Transcript, PageID20577-78. Managers who "failed to meet their sales, retention, and sales capacity targets … risked termination." R.320, Findings, PageID20969. But "[m]anagers risked no discipline or termination for telling agents what to do." *Id.*

Managers drive agent production because American Family owns the business agents run. *Id.*, PageID20954. American Family calls agents "business owners" and tells agents to "invest" in "their business." *Id.* None of this is true. Agents do not own the businesses they run and invest in. *Id.*, PageID20982. Agents do "not own a book of business" and have "no book of business separate and distinct from American Family's business." *Id.*, PageID20954, 20982. Agents cannot sell the agency or assign rights to agency income. *Id.*, PageID20954. The customers are American Family's customers "who are merely being serviced by the agents." *Id.* American Family retains control to "transfer customers to other agents at its own discretion, at any time," and to "reassign policies brought in by one agent, to other agents." *Id.*, PageID20954; PageID20982. So while American Family tells agents that they are "investing" in "their business," the reality is that

when agents terminate "[a]ny investment an agent makes to grow his client base is not recoverable…." *Id.*, PageID20955.

Moreover, American Family depends on the agents who run its books of business for nearly all of its $6 billion in annual premiums. *Id.*, PageID20949. Thus, American Family drives production by requiring agents to solicit new business by performing sales activities like cold calling, call nights, and conducting personal insurance reviews. *Id.*, PageID20976. "[A]gents did not feel that they were able to refuse to accept these duties." *Id.*, PageID20976. Managers enforce compliance with their instructions by threatening agents with reprimands or termination. *Id.*, PageID20984; PageID20982. "[Y]ou're threatened with it all the time, that your contract will be terminated." *Id.*, PageID20969. American Family also threatens and punishes agents who question whether the control it exercised was inconsistent with their independent contractor status. *Id.*, PageID20968.

The following are examples of American Family driving production by exercising its right to control the means and methods by which agents solicited insurance or serviced policies.

1. <u>American Family requires agents to do personal insurance reviews and file daily activity reports.</u>

American Family required agents to do personal insurance reviews ("PIRs"). R.320, Findings, PageID20976. A PIR is a sales activity in which agents interview existing customers to solicit new business. R.308, Transcript, PageID19414.

American Family directs agents "to do a minimum number of personal insurance reviews per week," and to "provide their managers with reports on their activities" to check compliance. R.320, Findings, PageID20966.

American Family also requires agents to "fill out daily activity and other reports." *Id.*, PageID20976. Activity reports are not production reports. Activity reports monitor the agents' day-to-day activities so managers can verify that agents have completed their expected sales activities. An excerpt of an American Family daily activity report form admitted into evidence is reproduced below:

***DAILY ACTIVITY REPORT***

**Name:** ______________________ **For the week ending Sunday __/__/____**

| ACTIVITY | MONDAY | | TUESDAY | | WEDNESDAY | | THURSD |
|---|---|---|---|---|---|---|---|
| | min. expected | actual | min. expected | actual | min. expected | actual | min. expected |
| # X-date obtained | 7 | | 7 | | 7 | | 7 |
| # of referrals received | 5 | | 5 | | 5 | | 5 |
| # of COI contacted | 3 | | 3 | | 3 | | 3 |
| # of bus. Cards passed out | 20 | | 20 | | 20 | | 20 |
| # of businesses contacted | 1 | | 1 | 1 | 1 | | 1 |
| # of hours cold calling and suspects contacted | 1 / 10 | | 1 / 10 | | 1 / 10 | | 1 / 10 |

R.327-4, Exhibit; R.308, Transcript, PageID19412-15.

In addition to activity reports, managers also "inspect the [agent's] office and oversee the agent's work practices." R.320, Findings, PageID20962; PageID20975-76.

2. American Family requires agents to do other sales activities.

American Family requires agents to do specific life insurance sales activities, like life call nights, an activity that requires agents to stay after normal business hours to solicit life insurance by calling prospective customers. *Id.*, PageID2066. For example, when senior American Family management demanded that agents sell more life insurance, lower-level managers reported back that they would require the agents to do specific sales activities, stating:

- "We are focused on every agent utilizing the PIR [personal insurance reviews]. We do random file audits to insure that they are being completed." R.327-29, Exhibit, PageID21935.
- "What I intend to do is set up Life call nights with their agencies." *Id.*, PageID21935.
- "Every agent will have a call night once a week…. I will be attending call nights in offices." *Id.*, PageID21936.
- "[A]gents will print their 'all accounts without life' and provide the entire listing to my office noting WHY the client does not have life insurance with their agency, and WHEN was the last time the agent contacted the client about their life insurance program." *Id.*, PageID21937.

Such efforts were then reported up to a Company officer to assure American Family that the sales force was "working at getting the Life sales." *Id.*, PageID21931.

American Family instructs agents "to adopt specific sales techniques and participate in sales campaigns directed at particular types of policies." R.320,

Findings, PageID20967. For instance, when American Family required agents to use a "matrix" sales technique, it told agents "everybody is going to do this," "you will do it," and "you don't have a choice." *Id.*, PageID20967. As one 30-year agent testified:

> [T]he only time I had a choice is if American Family wasn't affected at all. You know, they didn't care what color my furniture was. . . . But they directed me on what policies I sold, how I sold them, when I could take time off.

R. 304, Transcript, PageID18630.

American Family requires agents to follow certain "best practices" to solicit insurance and service customers. R.320, Findings, PageID20966. "Although agents were told these best practices were voluntary, their managers' compensation was tied to the agent's compliance with those practices," and "many managers implemented mandatory programs for their agents to increase compliance with these standards." *Id.* As a 27-year agent explained, "these practices were 'just another way of controlling my activities in – in the agency,'" and he "would have opted out if it were voluntary." *Id.* (quoting R.309, Transcript, PageID19804).

**D. American Family controls the agents' job opportunities.**

American Family "controlled the employment opportunities of its agents." R.320, Findings, PageID20983. Agents work exclusively for American Family, sell for no other company, and sign one-year non-solicitation agreements. *Id.*, PageID20954-55; PageID20983. American Family also "actively discouraged and

in some cases prohibited agents from taking" additional jobs "even if unrelated to insurance sales." *Id.*, PageID20983.

### E. American Family controls other aspects of its agents' work.

American Family controls "nearly every category" of its agents' work. *Id.*, PageID20982. It assigns the agents additional tasks such as property resurveys – a time-consuming task "unrelated to selling or servicing insurance" – to save itself money. *Id.*, PageID20967; PageID20976. American Family also requires agents to develop business plans, file activity reports, and to attend regular sales and training meetings "even if [the sales meetings] interfered with sales appointments…." *Id.*, PageID20967; PageID20976-77; PageID20982.

"American Family retained the right to approve the location of an agent's office…." *Id.*, PageID20975. Agents must maintain their office in the district American Family assigns them to. *Id.*, PageID20955. Offices must be branded as American Family agencies, and American Family prohibits home offices. *Id.*, PageID20955; PageID20975.

American Family retains the right "to regulate" the agents' decisions on when and how long to work. *Id.*, PageID20977. American Family requires agents to work at specific times and places, and managers "have the authority to enforce participation in these events." *Id.* Furthermore, American Family's "final say" over

business plans, and the "means of achieving" sales goals, "[i]mpacts the agents' ability to control their own hours." *Id.*

American Family requires agents to keep the offices open during regular business hours. *Id.*, PageID20976. If agents want to work outside the office, they must pay to hire staff to keep the office open. *Id.*, PageID20977. American Family also retains "the authority to approve or deny agent vacations," and has "reprimanded agents for taking vacation or otherwise being absent from the office without approval." *Id.*, PageID20977.

Finally, American Family controls who works in its agencies. While agents have "primary authority" on hiring, American Family retains the right to "override" that hiring decision, and to fire staff, for reasons irrelevant to regulatory compliance. *Id.*, PageID20978, PageID20980. It also imposes criteria on who agents may hire as appointed staff, such as education levels, even if the candidate is already licensed by the state. *Id.*, PageID20979. (Appointed staff is anyone who interacts with customers.) After Plaintiffs filed suit, American Family eliminated these criteria. *Id.*, PageID20958. Agency staff must also follow American Family's Code of Conduct, and American Family could "fire any agency staff, appointed or non-appointed, who did not live up [to] the [Code]." *Id.*, PageID20979. The Code covers non-regulatory issues like prohibiting off-color jokes in the agencies, and American Family has a hotline for agency staff to file complaints against agents or

co-workers. R.332-2, Exhibit, PageID24600, PageID24596. American Family also requires agency staff to sign lifetime bans "prohibiting any contact with American Family agency clients." *Id.* As the district court found, American Family always retains "some authority to approve or disapprove" who agents hired as staff and "the right to fire agency staff…." R.320, Findings, PageID20979.

## II. The district court's legal analysis focuses on American Family's right to control the manner and means of the agents' service.

The district court concluded that American Family's control over the agents' manner and means of selling and servicing insurance policies made them employees. It observed how "courts are instructed to look at the degree to which the hiring party retains the right to control the manner and means by which the service is accomplished." *Id.*, PageID20947 (citing *Darden*, 503 U.S. at 323-24, and *Weary*, 377 F.3d at 524). It found that five of *Darden's* factors favored employee status: (i) skill required; (ii) duration of the relationship; (iii) right to assign additional projects; (iv) control over when and how long to work; and (v) whether the work is part of the hiring party's regular business. *Id.*, PageID20981-82. Only four factors favored independent contractor status: (i) source of the instrumentalities and tools; (ii) location of the work; (ii) providing employee benefits; and (iv) tax treatment. *Id.*, PageID20974-75, PageID20980-81. The method of payment factor favored employee status during training and independent

contractor status after training. *Id.*, PageID20978. American Family's role in hiring and paying assistants was neutral. *Id.*, PageID20980.

The district court focused its analysis, however, on its findings of fact about American Family's right to control the agents' sales and service activities. *Id.* PageID20982-85. As it observed, "[t]he 'employer's ability to control job performance and the employment opportunities of the aggrieved individual' are the most important of the many factors to be considered." *Id.*, PageID20982 (quoting *Marie v. Am. Red Cross*, 771 F.3d 344, 356 (6th Cir. 2014). American Family controlled the agents' employment opportunities. *Id.*, PageID20983. Based on its findings of fact about American Family's right to control the manner and means of the agents' service, "along with the evidence related to the other factors," the district court found that Plaintiffs' proved by a preponderance of the evidence that the agents were employees under ERISA. *Id.*, PageID20984-85. Indeed, the district court found that none of the "cases show retention of the same level and breadth of control by the Company that was evidenced in this case." *Id.*, PageID20984.

## SUMMARY OF THE ARGUMENT

American Family had a choice. If it classified its agents as independent contractors, it had to relinquish the right to control them. If it wished to retain the right to control, it had to classify them as employees. Yet since it depends on the agents and its books of business for most of its $6 billion in annual premiums, American Family decided that it was too risky to relinquish control but too expensive to classify the agents as employees. So American Family classifies the agents as independent contractors to reduce its costs but retains control over the agents' manner and means of soliciting and servicing insurance policies. American Family's brash conduct violates the law and is contrary to precedent.

Caught in the open, American Family throws-up two defenses and lots of smoke. First, it disputes the district court's findings of fact, claiming that the lower court confused control over goals and objectives with control over the manner and means of the agents' service. But the court made express findings of fact that American Family has the right to control the manner and means of the agents' service; indeed, directing agents how to solicit insurance and do business is control over the manner and means of their service. In any case, American Family cannot relitigate factual disputes it lost below on interlocutory appeal. *Wilks v. Pep Boys*, 278 F. App'x 488, 489 (6th Cir. 2008) (collecting cases).

Second, American Family claims that *Darden's* common-law test focuses on so-called structural factors "in the insurance context," not the right to control in reality. This is indisputably wrong. To start, the issue in *Darden* was how to determine if an insurance agent was an "employee" under ERISA – the same issue as here – and the Court held that the common-law test for an employee focuses on the hiring party's right to control. *Darden*, 503 U.S. at 323-24. This Court has also held that the "hiring party's right to control" is the "most important consideration" in ERISA benefits cases, *Trs. of the Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 249-50 (6th Cir. 2005), and the "crux" and "core issue" when determining whether an insurance agent is an independent contractor or employee. *Weary*, 377 F.3d at 525. The term "structural factors" is just a euphemism American Family invented to argue the indefensible – namely, that courts should focus on how companies describe the parties' relationship in a contract, and not on how the companies' exercise their right to control the workers in reality. How a contract characterizes a relationship is not controlling in the face of the conflicting reality.

The district court applied the correct legal analysis, therefore, by focusing on American Family's right to control. While this Court has found that insurance agents were independent contractors, in each case the outcome turned on facts showing that the company retained no meaningful control over the manner and

means of the agents' service. American Family's brash conduct distinguishes this case from all others. Even *amici* agree that it is "black-letter law" that companies may not label agents independent contractors and then exercise control over which products the agents' sell or how the agents solicit insurance. Dkt.38 at 4; Dkt.29 at 9. They just ignore the district court's findings that this is exactly what American Family does here. No court has found that insurance agents are independent contractors even when, as here, the company's internal documents state that it has the right to control the agents and it regularly exercises its right to control.

American Family's other arguments about various *Darden* factors are factual in nature and raise no legal issues. For example, American Family argues that the skill required factor *always* favors independent contractor status for insurance agents. But both cases and a treatise reflect how it is perfectly reasonable to conclude that American Family sought out inexperience agents because it wants to train them to perform the services in a particular method or manner. The district court's fact-based conclusions about this and other factors are not erroneous as a matter of law.

Finally, although th.ise Court denied American Family's petition to appeal the order denying decertification, American Family raises the issue anyway. Since it denied the petition, the Court should refuse to entertain those arguments. Further, contrary to what American Family claims, the district court never relied on

representative evidence as proof of American Family's company-wide policy to retain the right to control. Instead, it relied on American Family's internal documents and witness testimony, including American Family Rule 30(b)(6) testimony, that these documents reflected American Family's long-standing policy on how it expected it managers to manage the agents' businesses.

Misclassification is a national problem that hurts workers as well as law-abiding companies who must compete against companies like American Family that unlawfully lowers its costs. To adopt American Family's and its *amici's* characterization of the law will invite abuse and erase any meaningful line separating independent contractors from employees. Affirming the district court's opinion, however, fosters both predictability and compliance with the law by, among other things, encouraging companies to have policies and training in place to ensure that they appropriately manage their independent contractor agents. Instead of revamping the law to conform to American Family's outrageous conduct, the Court should affirm and have American Family revamp its conduct to comply with the law.

## ARGUMENT

### I. Standard of Review: The Court accepts the district court's findings of fact as true and disregards American Family's disputes about them.

In this interlocutory appeal from a bench trial, American Family attacks and questions the district court's findings of fact and claims that review is *de novo*. Br.15. That is incorrect; the case American Family cites, *Resilient Floor*, 395 F.3d at 249, is reviewing a summary judgment order. To adhere to the proper standard of review, therefore, it is important to establish the issues that are *not* before this Court.

The employee-independent contractor issue "'is a mixed question of law and fact.'" *Weary*, 377 F.3d at 524. After a bench trial on the independent contractor-employee issue, this Court normally reviews the "findings [of fact] for clear error but review[s] *de novo* the district court's application of the legal standard to them." *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011). *See also Union Sec. Ins. Co. v. Blakeley*, 636 F.3d 275, 276 (6th Cir. 2011) (same standard after bench trial in ERISA case); *Berger Transfer & Storage v. Cent. States Pension Fund*, 85 F.3d 1374, 1377-78 (8th Cir. 1996) ("ultimate conclusion [on employee-independent contractor issue] is a question of law," but the "existence and degree of each factor is a question of fact") (quoted case omitted; citing *Waxman v. Luna*, 881 F.2d 237, 240 (6th Cir. 1989).

In this interlocutory appeal, however, American Family "is limited to challenging the district court's legal conclusions and cannot relitigate factual issues." *Wilks*, 278 F. App'x at 489 . Thus, the Court accepts the findings of fact as true and reviews *de novo* whether the district court applied the correct legal standard to its fact findings. *Id.* (collecting cases). Indeed, in its petition, American Family stated that it would accept the findings of fact "as true," and that the only issue of law is whether the district applied the correct legal standard to those fact findings. Case No. 17-307, Dkt.18, Reply at 6-7.

Yet American Family now disputes the district court's findings of fact on appeal. For example, without citing any findings, American Family states that it "left the day-to-day details—what hours to work, what clients to solicit, how to treat clients, and how to manage staff—up to individual agent discretion." Br.42. The district court found, however, that "American Family closely supervised its agents," and its managers "were generally very involved in the *day-to-day activities* of their agents." R.320, Findings, PageID20972 (emphasis added).

Without citing any findings, American Family claims that the district court "conflated control over a company's goals and objectives (which comports with independent contractor status) with control over the manner and means of an agent's production (which evinces employee status)." Br.2. That is untrue. The district court found that "American Family trained its managers to exercise control

over the *means* and *manner* of agents' *sales* and *service*," and that the "managers, consistent with their training, acted as if they had the right to control the *manner* and *means* by which their agents *sold* and *serviced* insurance policies." R.320, Findings, PageID20984-85 (emphasis added). The district court even provided examples of activities that American Family required its agents to do to solicit insurance. *Id.*, PageID20976.

The Court must disregard these and other factual disputes American Family raises about the district court's findings of fact. "'To the extent that an appellant on an interlocutory appeal argues issues of fact and law on appeal, this Court will only entertain pure issues of law,'" and it accepts the findings of fact as true. *Wilks*, 278 F. App'x at 489 (quoted case omitted). The findings of fact also must be "liberally construed" in support of the district court's opinion even if they "are not as explicit or detailed as might be desired." *Solis*, 642 F.3d at 530 (quoted case omitted). And "[i]f, from the facts found, other facts may be inferred which will support the judgment, such inferences should be deemed to have been drawn by the District Court." *Id.* (quoted case omitted).

## II. The district court applied the proper legal standard.

### A. *Darden's* test in ERISA cases focuses on the right to control the manner and means of the agents' service in reality.

"[T]he proper test" for whether a party is "an employee or an independent contractor … is the 'common-law agency test' set forth in [*Darden*]." *Weary*, 377 F.3d at 524. *Darden* held that courts look to the common-law test for an employee to determine whether an insurance agent is an "employee" under ERISA. *Darden*, 503 U.S. at 323. The Court held that "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished." *Id.* (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)). "'Among the other factors relevant to this inquiry are

1. the skill required;
2. the source of the instrumentalities and tools;
3. the location of the work;
4. the duration of the relationship between the parties;
5. whether the hiring party has the right to assign additional projects to the hired party;
6. the extent of the hired party's discretion over when and how long to work;
7. the method of payment;
8. the hired party's role in hiring and paying assistants;

9. whether the work is part of the regular business of the hiring party;
10. whether the hiring party is in business;
11. the provision of employee benefits; and
12. the tax treatment of the hired party.'"

*Id.* at 323-24 (quoted case omitted; numbering added). Moreover, "it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so." *Peno Trucking, Inc. v. C.I.R.*, 296 F. App'x 449, 456 (6th Cir. 2008). "It is the right to control, not its exercise, that determines an employee relationship." *N.L.R.B. v. Cement Transp., Inc.*, 490 F.2d 1024, 1027 (6th Cir. 1974).

Disregarding precedent, American Family argues that *Darden*'s test for insurance agents in ERISA benefits cases allegedly "focuses on the structure of the relationship in the insurance context," not the right to control, and thus "the most important factors [in *Darden*'s test] are the agents' structural and financial relationships with the insurance company." Br.16, 18. Yet *Darden* squarely holds that for insurance agents in ERISA benefits cases, the common-law test for an employee focuses on "the hiring party's right to control…." *Darden*, 503 U.S. at 323-24. American Family resolves this contradiction by deleting *Darden's* reference to the right to control when quoting that case. Br.17. American Family's "structure of the relationship" argument is also exactly the kind of truncated analysis *Darden* rejected, stating that there is "'no shorthand formula or magic

phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Darden*, 503 U.S. at 324 (quoted case omitted).

This Court's precedent is also clear that for insurance agents in ERISA benefits cases, *Darden's* common-law test focuses on the hiring party's right to control. In *Resilient Floor*, this Court held that in ERISA benefits cases the "most important consideration is whether the employer has a 'right to control the manner and means by which the product is accomplished.'" *Resilient Floor*, 395 F.3d at 249-50 (quoting *Darden*). In *Weary*, the Court held that for insurance agents, the "core issue" and "crux of *Darden*'s common law agency test is 'the hiring party's right to control….'" *Weary*, 377 F.3d at 525 (quoting *Darden*, 503 U.S. at 323). This Court has never adopted American Family's position. Just the opposite, because *Darden*'s common-law test focuses on the right to control, this Court has "repeatedly held that the 'employer's ability to control job performance and the employment opportunities of the aggrieved individual' are the most important of the many factors to be considered.'" *Marie*, 771 F.3d at 356 (quoted and cited cases omitted).

The term "structural factors" is just a phrase American Family invented to repackage an otherwise untenable argument that courts focus on contract terms to determine employee or independent contractor status, not the company's real-

world practices and conduct. While a contract is "relevant" and "shed[s] light on" the parties' intent, the district court was correct that it is just one factor and "not dispositive of the issue." *Weary*, 377 F.3d at 525. Contract terms are "not controlling in the face of the conflicting reality." *First Liberty Inv. Grp. v. Nicholsberg*, 145 F.3d 647, 652 (3d Cir. 1998). "Whether an employment relationship exists under a given set of circumstances 'is not fixed by labels that parties may attach to their relationship….'" *Solis*, 642 F.3d at 522 (quoted case omitted).

Finally, American Family argues that because the Court in *Reid* rejected an "actual control" of the product test, that *Reid* supports its position that courts focus on the contractual terms, not the actual control the parties exercised. Br.20. American Family misreads *Reid*, a copyright case that defined the common-law test for an employee that *Darden* adopted. *Darden*, 503 U.S. at 323-34. The "actual control" of the product test at issue in *Reid* looked to control over goals, like whether a bronze figure is seated or standing. *Reid*, 490 U.S. at 750-51. The Court rejected that test because the key question was the hiring party's right to control not only goals, but also the manner and means by which the hired party achieved those goals. *Id.* at 751. *Reid* never held, or suggested, that a party's actual control over the manner and means of a worker's service is irrelevant or should be given less weight. *Reid* provides no support for American Family's position.

### B. American Family's right to control distinguishes this case from precedent.

This Court, in its previous cases finding that agents are independent contractors, never focused its analysis on the "structure of the relationship." Instead, consistent with *Darden*, this Court focused on the company's right to control; in every case, it concluded that there was no evidence that the insurance company retained a right to control the agent's judgment on how to solicit insurance and service customers.

Thus, in *Weary*, the agent was an independent contractor because the agent "controlled the manner and means by which he performed his job." *Weary*, 377 F.3d at 526. Moreover, unlike this case, the agent in *Weary* was "free to take other jobs," and sold insurance for fourteen other companies. *Id.* He "worked either at his home office or at commercial office space that he rented," had sole discretion in hiring and firing, and was not required to file reports about his activities. *Id.* at 527. Moreover, as a full-time life insurance agent, and thus a "statutory employee" under the IRS Code, the company could provide pension benefits without converting the agent into an employee. *Id.* at 527-28. The agents here are not statutory employees.

In *Ware*, the agent was an independent contractor because he was "free to utilize whatever sales techniques he preferred." *Ware*, 67 F.3d at 576. Moreover, *Ware* was a tax case where, instead of applying *Darden's* right to control test, the

Court focused on the IRS twenty-factor test to decide "which party stands to profit from the [agent's] expenditures" and can deduct them from gross income. *Id.* at 579. That analysis is inapplicable here.

American Family also takes *dicta* in *Ware* out of context to argue that the right to control is less important in ERISA cases. In the passage American Family cites, the Court is saying that because the copyright statute favors ownership by the work's creator, courts may require a stronger showing of the hiring party's control than in ERISA cases. *Ware*, 67 F.3d at 578. So if anything, *Ware* states that a lesser showing of control is necessary in ERISA cases than in copyright cases – which is consistent with ERISA's intent to protect employees' interests in their pension benefits. American Family position that *Ware* allows it to exercise *more* control over independent contractors in ERISA cases undermines ERISA's protections. In any case, *Ware* is not an ERISA case and never held that the right to control is less important in ERISA cases.

Likewise, there was no evidence that the company controlled the manner and means by which the agents performed their jobs in either *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F2d 245 (6th Cir. 1989), or *Plazzo v. Nationwide Mut. Ins. Co.*, 892 F.2d 79 (6th Cir. 1989) (unpublished) – both decided before *Darden*. And in *Moore*, the agent was an independent contractor because the company "exercised no significant control over how [the agent] performed his

duties." *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 439 (6th Cir. 2006). Other courts also find that insurance agents are independent contractors by focusing their analysis on whether the company retained the right to control the manner and means of the agents' services. *See Schwieger v. Farm Bureau Ins. Co.*, 207 F.3d 480, 487 (8th Cir. 2000). (agent "free to conduct her business when, how, and with whomever she chose, with little or no supervision of her day-to-day activities"); *Oestman v. Nat'l Farmers Union Ins. Co.*, 958 F.2d 303, 306 (10th Cir. 1992) (agent "subject to virtually no restrictions" and "was free to work as he chose"). As all of these cases reflect, the "employee-independent contractor inquiry is fact-intensive." *Schwieger*, 207 F.3d at 484.

American Family's right to control its agents' manner and means of soliciting and servicing insurance policies puts this case far beyond any conduct that this or any other court has approved as consistent with the independent contractor classification. American Family and *amici* cite no factually analogous case. In fact, the Council for Life Insurers acknowledge how it is "black-letter law" that companies cannot both label agents independent contractors and still dictate "how the sales should be accomplished." *Amicus*, Dkt.38 at 10. The insurance associations also agree that "'[s]upervision of the 'means and manner' of the worker's performance renders him an employee….'" *Amicus*, Dkt.29 at 18 (quoted case omitted). Directing agents how to solicit insurance and do business is control

over the manner and means of their service, and this is exactly what the district court's findings of fact establish that American Family does here. *See e.g.*, R.320, Findings, PageID20972; PageID20984-85. The district court correctly applied the law to conclude that the agents are employees under ERISA.

### C. American Family's structure of the relationship argument invites abuse.

American Family also argues that the Court should alter *Darden's* common-law test to focus on the structure of the relationship because this purportedly will "furnish predictable results" by allowing "categorical judgments" about the workers' status. Br.20. That is a profoundly cynical plea. *Darden's* common-law criteria allow categorical judgments because its "application generally turns on factual variables within an employer's knowledge…." *Darden*, 503 U.S. at 327. American Family knows what it writes in internal documents and had all of the information it needed to make a categorical judgment that it treats the agents as employees. If it really was concerned about predictability, it could have directed its human resources function, or similar experts, to review its practices to avoid misclassification issues. But it did not and chose to look the other way to save tens of millions of dollars, mislead the agents and avoid complying with federal law.

In fact, this is neither the first nor the second time that American Family agents have been found to be employees. The IRS earlier determined that American Family agents were employees "under the common law rules" because

American Family trained its managers "to supervise the agents assigned to him" and "permit no deviation from following the instructions he gives his agents." R.332-18, 1973 IRS TAM, PageID24834. American Family obtained an IRS letter ruling in 1993 that the agents were independent contractors, but only after it told the IRS that "the facts have changed" and its training manuals "no longer provide[] that [managers] should permit no deviation from instructions." R.332-11, Exhibit, PageID24794. The district court's findings demonstrate that this representation is no longer accurate, if it ever was.

American Family lost the issue again in *Am. Family Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 352 (8th Cir. 2013), where the court found that an American Family agent is an employee under an Iowa wage law. American Family argued below that *Hollander* is irrelevant, claiming that Iowa's wage law applies to independent contractors, but that is wrong. The Iowa wage law "by its terms protects only 'employees'—not independent contractors." *Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 216-17 (Iowa 1984). *See also Arthur L. Christoffersen Irrevocable Tr. v. Yellow Book USA*, 536 F.3d 947, 951 (8th Cir. 2008) (Iowa wage law inapplicable to independent contractors). The common-law test for an employee under Iowa and federal law is also the same. *Kramer v. Cash Link Sys.*, 715 F.3d 1082, 1088 (8th Cir. 2013).

*Darden* has never been interpreted to foster subterfuge by elevating what a party writes into a contract over how the party acts in reality. Misclassification is already a significant problem. It hurts not just workers, but the public fisc in the form of lower tax revenues and also "law-abiding business owners who don't get to compete on a level playing field when some employers wrongly classify their workers as independent contractors and thereby lower their costs unlawfully."[3] Yet the only predictable consequence of American Family's "structural factors" rubric is abuse of the independent contractor designation. That is yet another reason to reject American Family's arguments as contrary to settled and binding precedent.[4]

## III. American Family agrees that a right to control manner and means shows employee status. It just disputes the findings of fact on this issue.

American Family agrees that "control over the manner and means of an agent's production (which evinces employee status)," would make the agents employees. Br.2. That should end this appeal, because the district court expressly

[3] https://www.dol.gov/whd/workers/Misclassification/myths.htm#4 (last visited March 1, 2018).

[4] The Chamber of Commerce *amicus* points to American Family's potential ERISA liability to raise the specter that affirming threatens to ruin the Company. Dkt.37 at 8.n.3. American Family has over $7.5 billion in equity (surplus), and it expressly assured the public that it is "financially strong to withstand a possible court judgment." www.jsonline.com/story/money/business/2017/08/02/judge-says-americanfamily-agents-employees-not-independent-contractors/533927001/ *See also* https://www.amfam.com/2016-report (last visited March 3, 2018).

found that American Family has the right to control the manner and means of its agents' production. *See* R.320, Findings, PageID20972, PageID20977; PageID20983-85. American Family disputes these findings, but this Court does not review fact findings on interlocutory appeal. *Wilks*, 278 F. App'x at 489.

American Family also states that "coaching agents to meet [their] goals," is consistent with independent contractor status. Br.29. As Plaintiffs proved at trial, "coaching" is yet another euphemism that American Family lays over the facts to obscure its right to control. For American Family, "coaching" is visiting an agent in the hospital after his heart attack to tell him to open his office or be fired. R.307, Transcript, PageID19396-98. "Coaching" is requiring agents to do sales activities like cold calling. R.320, Findings, PageID20976. "Coaching" is telling agents "you don't have a choice" to adopt specific sales techniques to solicit insurance. *Id.*, PageID20966-67. As American Family's Chief Sales Officer stated in an internal document: "To many [managers], coaching is yelling at the agent or saying do it my way." R.329-5, Exhibit, PageID23134. The district court agreed when it weighed and rejected these "coaching" or "suggesting" arguments.

American Family also claims that it "only assumed an active role over struggling agents" to help them meet their sales goals. Br.31. There are no findings of fact, however, that American Family limited its control to struggling agents. In fact, American Family never raised this argument before and previously dismissed

evidence of control as mistakes. R.320, Findings, PageID20970. *See also* R.306, Transcript, PageID19152 (Q**:** Why does it happen? A: I think we're human. We make mistakes."). The district court found this excuse not credible and contradicted by the evidence. R.320, Findings, PageID20970. Review of those findings is beyond the scope of this appeal.

Further, no case holds that employers have a right to control struggling independent contractors as opposed to successful ones. For good reason: the definition of a struggling independent contractor is subjective and easily manipulated to obscure bad practices. Indeed, at American Family, "[n]umbers could be manipulated 'depending on which numbers [the manager] wanted to pull out of the hat,' and this process generally targeted veteran agents with established agencies to persuade them to retire." R.320, Findings, PageID20965. Thus, "agent[s] could run a solid, profitable agency but still risk termination if [they] did not grow at the pace American Family demanded or grew at a slower pace than other agents in the district." *Id.* For example, after one 27-year veteran agent pushed back against his manager's control, American Family terminated him for "lack of production," even though he ran a "solid agency" that made the Company about "a million dollars a year of profit" and was in the upper third of agents in his district. R.309, Transcript, PageID19812-13, PageID19856. When American

Family says it controls "struggling agents," it usually means pressuring older agents to retire or retaliating against agents who complain about its control.[5]

## IV. Other *Darden* factors support the district court's conclusion.

### A. American Family intends to treat the agents as employees.

A factor relevant to *Darden's* analysis is "how the parties themselves viewed the nature of their working relationship." *Weary*, 377 F.3d at 525. Here, American Family intended to treat agents like employees, but labeled them independent contractors. As discussed above, despite the contract, American Family trained and expected its managers "to exercise control over agents' methods and manner of performing their services," and reprimanded them if they did not. R.320, Findings, PageID20972, PageID20983-85. American Family misleading its agents about their independent contractor status and treating them as employees weighs heavily in favor of employee status. *Weary*, 377 F.3d at 525 (evidence of parties' intent sheds light on how they viewed the relationship).

[5] American Family also portrays Plaintiffs as "struggling agents," even though two of them run successful independent insurance agencies now that they no longer must follow "American Family's way" of doing business. R.308, Transcript, PageID19427, PageID19435; R.307, Transcript, PageID19231-32. The third Plaintiff works for a state university. R.309, Transcript, PageID19862.

### B. The skill required reflects employee status.

"The test for [the skill required] factor is 'not the amount of skill required but, rather, whether the skill is an independent discipline (or profession) that is separate from the business and could be (or was) learned elsewhere.'" *Janette*, 298 F. App'x at 474 (quoting *Weary*, 377 F.3d at 532 (dissent)). Thus, "if the individual requires substantial training and supervision, an employee/employer status is more likely." *Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2001).

American Family argues that evidence of training is irrelevant and this factor always favors independent contractor status for insurance agents. But as reflected in the *Janette* and *Worth* cases, "requir[ing] an experienced employee to help train a worker … indicates that the person for whom the services are performed wants them performed in a particular method or manner." Robert Wood, LEGAL GUIDE TO INDEPENDENT CONTRACTOR STATUS, 4-17 (Tax Institute, 2010).[6] Thus, in *Aymes*, this factor favored independent contractor status because the computer programmer's job "demanded that he use skills developed" elsewhere. *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992). By contrast, in *Rumpke*, this factor favored employee status because the position required no experience and defendant "provided or required training for new drivers, which demonstrated company

[6] American Family designated Robert Wood as an expert witness for trial, but he never testified. R.240-1, Defendants' Witness List, PageID17093.

control and a lack of independence of skills….” *Rumpke v. Rumpke Container Serv.*, 240 F. Supp. 2d 768, 772 (S.D. Ohio 2002).

The district court was correct that the skill required factor favors employee status. American Family sought people without expertise or experience in selling insurance, or even a license to do so. The agents did not run businesses separate and distinct from American Family's business; American Family taught these inexperienced agents everything they needed to know to do business and sell insurance the "American Family way." R.320, Findings, PageID20973. These facts are absent from any of this Court's prior cases and show how American Family wanted agents to perform their services in a particular method or manner.

### C. The right to assign additional projects and control over when and how long to work reflect employee status.

The district court found that American Family's right to assign its agents additional duties "provided evidence of a high level of control by the company over how and when the agents performed their job of selling insurance." R.320, Findings, PageID20976. That conclusion is firmly rooted in precedent. "[T]he right to assign additional projects, and the discretion over when and how long to work are *Darden* factors that … are related to one another and bear very strongly on the issue of control." *Marie*, 771 F.3d at 356.

American Family's arguments otherwise raise no issues of law; rather, it disputes and misstates the findings of fact. American Family claims that "[t]his is not a case" of it requiring agents to do activities unrelated to selling or servicing policies. Br.44. That distinction is irrelevant, however, as American Family's right to require agents to do sales activities related to selling insurance – such as life calls or using specific sales techniques – makes the agents' employees. In any case, American Family ignores how it required agents to resurvey properties – a task "unrelated to selling or servicing insurance." R.320, Findings, PageID20967; PageID20976. American Family also argues that requiring agents to submit "production reports" is consistent with independent contractor status. Br.44. But American Family also require agents to submit "daily activity reports" to monitor their day-to-day sales activities. R.320, Findings, PageID20977.

American Family claims that because the contract states that agents will meet "the Company's production, profitability and service requirements," that it has a contract right to control the agents' sales activities B.44. But this contract term refers to setting production, profitability and service goals, not the manner and means of achieving those goals. Nonetheless, American Family had a senior executive testify at trial that this contract term gave American Family the right to do more than set goals; it gave American Family a right to compel agents to do mandatory life calling, personal insurance reviews, and other activities to solicit

insurance and service customers to achieve those goals. R.309, Transcript, PageID19707-10. That makes the agents employees under American Family's interpretation of the contract.

American Family then argues (inconsistently) that it has no "legal right" to assign additional tasks to agents, claiming that these were "[m]ere requests" agents could ignore. Br.45. American Family even argues that the district court never identified a "written policy or contractual provision that required" the agents to follow their managers' instructions. *Id*. This mischaracterizes and ignores the record. The district court found that American Family's internal documents expressly stating its right to compel agents to comply with its instructions "documented the approach American Family wanted their managers to take when managing agents." R.320, Findings, PageID20983. In any case, these are factual arguments that American Family raised at trial and the trier of fact rejected.

Further, no court has ever held that unless the company has a "legal right" to assign additional activities, then it is irrelevant if the company does so in practice and threatens workers with termination if they refuse to comply. Indeed, this is just another permutation of American Family's untenable argument that courts should focus on the contract and not what the company does in real-world practice. The case American Family cites, *Janette*, also provides no support as it held only that under the facts there "[i]f any such requests [to do additional tasks] were made,"

the worker "had a right to decline them or negotiate for additional pay." *Janette*, 298 F. App'x at 475. Here, by contrast, the district court made no findings of fact that agents could decline the tasks or negotiate for additional pay. Instead, it found that American Family instructed its managers that they have "authority to enforce" participation and to threaten termination if "an agent disagreed with them." R.320, Findings, PageID20977; PageID2098-85.

### D. American Family leverages the duration of the relationship, and that the agents' work *is* American Family's business, to control the agents' job performance.

The district court is correct that the duration of the relationship, and that the work is part of the hiring party's regular business, both "clearly favor" employee status. *Id.*, PageID20980-82. In evaluating the duration of the relationship, the court looks to "whether the relationship was one of a long-term at-will employee or one to complete a particular task in a specified time-frame.'" *Marie*, 771 F.3d at 358 (quoted case omitted). "Evidence of an indefinite duration favors employee status rather than independent contractor status." *Absolute Roofing & Constr. v. Sec'y of Labor*, 580 F. App'x 357, 362 (6th Cir. 2014). Also, "[t]he more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 815 (6th Cir. 2015).

Citing *Weary*, American Family argues that both of these factors are of "little consequence" for insurance agents. Br.36 n.3. But in *Weary* the agent was "free to take other jobs" and represented "fourteen other insurance companies." *Weary*, 377 F.3d at 526. Also, in *Weary*, the court found only that the work being part of the insurance company's business did not offset the "overwhelming evidence" that the company exercised no right to control the agents' manner and means of selling insurance. *Weary*, 377 F.3d at 528. Here, by contrast, the agents work exclusively for American Family for an indefinite term, and the Company also controlled the agents' ability to take jobs outside the insurance industry – just like an employee. R.320, Findings, PageID20983. "[H]aving a single employer is generally an indicia of employee status." *Ware*, 67 F.3d at 579. Also, the agents' work here "is not only an integral part of American' Family's regular business, but is part and parcel of its core function … to sell and service insurance policies." R.320, Findings, PageID20980.

American Family also leverages both of these factors to control the agents' job performance. American Family argues that an agents' "ability to invest in her business and profit from her own efforts further demonstrates that agents controlled their own manner and means of insurance sales." Br.34. Yet it cites no findings of fact, because it is a myth. The district court found that the agents do not own the businesses they "invest" in and cannot recover any "investment" if

terminated. R.320, Findings, PageID20955. After an agent is terminated, American Family keeps the book of business – the income-producing asset – while the agent loses her investment and is left with the bills and the debts. *Id.* (citing R.310, Transcript, PageID20109 ("If I have a disagreement with the company tomorrow, my business is gone, per se, with regard to American Family. I still have the debt and the bills.")). This is why agents fear even the threat of termination. The agents' business *is* American Family's business, and this complete integration of the "worker's services into the company's business operations generally shows that the worker is subject to direction and control." Robert Wood, LEGAL GUIDE TO INDEPENDENT CONTRACTOR STATUS, 10-9 (Tax Institute, 2010).

### E. American Family's right to fire and hire agency employees renders that factor neutral.

The district court concluded that this factor was neutral because both parties exercised authority. It found that while the agents had "primary" authority to hire and fire staff, and to pay them, American Family had the right to (i) "override" the agents' hiring decision, and (ii) to fire an agent's staff for any reason, and not just to ensure compliance with insurance laws. R.320, Findings, PageID20979-80. The district court's conclusion is not erroneous as a matter of law. *C.f. Schwieger*, 207 F.3d at 486 (factor was a "mixed question" where agent hired and paid assistants, but company set amount, method and timing of pay).

American Family argues that the test should focus only on the agents' authority and ignore American Family's authority. Br. 46, 47. That is illogical. A worker's authority to hire and fire is defined by the hiring party's authority, and vice versa. For example, in *Weary*, the factor favored independent contractor status because the agent had "sole discretion" to hire and fire staff. *Weary*, 377 F.3d at 527. In *Schwieger*, the factor was neutral because the agent and the company both had authority. *Schwieger*, 207 F.3d at 486. And in *Absolute Roofing*, the factor favored employee status, because the worker had "no authority to hire or fire anyone…." *Absolute Roofing & Constr. v. Sec'y of Labor*, 580 F. App'x 357, 363 (6th Cir. 2014). In each case, the worker's authority – from sole, to some, to none – is defined by the hiring party's authority to influence or overrule.

Plaintiffs contend that this factor is further evidence of American Family's right to control how the agents ran its agencies. Nonetheless, the district court did not err as a matter of law when it concluded that the mix of authority between agents and the Company made this factor neutral.

## V. The remaining factors are contractual in nature and cannot outweigh reality and American Family's right to control

The source of the instrumentalities and tools, location of the work, tax treatment, and method of payment factors all are contractual in nature. American Family's form contract provides that the agent is an independent contractor for

"federal taxation" purposes. R.320, Findings, PageID20952. The contract provides that agents will be paid by commission, R.326-1, Jt. Exhibit, PageID25035 (§ 5.a), and that agents are responsible for maintaining an office, including all expenses. *Id.*, § 4.k. Even assuming these contractual factors favor American Family, the district court did not err as a matter of law when it concluded that they were outweighed by the overwhelming evidence of American Family's right to control the agents' manner and means of soliciting new business and servicing customers.

Also contractual in nature is American Family's exclusion of the agents from its employee pension and other benefit plans. American Family alone forms these plans and, subject to limitations irrelevant here, nothing prohibits it "from distinguishing between groups or categories of employees, providing benefits for some but not others." *Bronk v. Mountain States Telephone & Telegraph, Inc.*, 140 F.3d 1335, 1338 (10th Cir. 1998).

American Family does provide a "retirement or pension plan" to agents. R.320, Findings, PageID20981. Plaintiffs contend that American Family providing a pension plan for agents is "an unusual arrangement for an independent contractor," *Schwieger*, 207 F.3d at 486, because it is a fringe benefit provided to employees. In any case, the district court did not err as a matter of law when it concluded that this factor was outweighed by the overwhelming evidence of American Family's right to control.

## VI. The district court never relied on so-called representative evidence as proof of a company-wide policy to retain the right to control.

This Court denied American Family's petition to review the district court's order denying decertification because it "is a fact-based ruling" that presented no question of law or substantial grounds for differing opinions. Case 17-308, Dkt.15-2. Undeterred, American Family raises the same "representative evidence" arguments about certification and class-wide proof anyway. *Id.*, Dkt.1, Petition, at 14-17. The Court should deny American Family's appeal of this issue for the same reason it denied the petition to review. If the Court addresses the issue, it should reject American Family's arguments and affirm for the following reasons.

### A. The district court identified a common policy applicable to all agents and did not rely on representative evidence.

American Family's argument that the district court "never identified a common, overarching policy that applied to all American Family agents" is false. Br.49. As discussed above, the district court made findings of fact that American Family's longstanding, company-wide policy is that it has the right to exercise control over the manner and means of the agents' service, and American Family trains and expects its managers to exercise this right. *See e.g.,* R.320, Findings, PageID20972, PageID20983-85.

American Family's argument that the district court relied on representative evidence to establish this policy misstates the record and the caselaw. First, neither

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016), nor *Monroe v. FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017), are analogous. In both cases the issue was the use of representative evidence as class-wide proof of the uncompensated time employees worked when their employers kept no records. *Tyson Foods*, 136 S. Ct. at 1041; *Monroe*, 860 F.3d at 400-01. There is no such issue here.

Second, American Family is wrong that the plaintiffs in *Monroe* relied on a representative sample of fifty class members to prove a company-wide time-shaving policy. Br.51. In *Monroe*, plaintiffs "presented documentary evidence and testimony from technicians, managers, and an executive showing that [defendant's] time-shaving policy originated with [defendant's] corporate office." *Monroe*, 860 F.3d at 394. Similar to *Monroe*, Plaintiffs proved the American Family policy primarily through American Family's internal documents, other documents, and corroborating testimony by Company and other witnesses. *See e.g.*, Statement of the Case, Section I. This compelling, direct evidence of American Family's company-wide policy amply supports district court's fact findings.

**B. The district court resolved conflicting testimony.**

The record contradicts American Family's claim that the district court never resolved "conflicting testimony" about American Family's company-wide policy. As the district court observed, American Family claimed that its documents, instructions and training were a "mistake." R.320, Findings, PageID20970. The

district court found that "[t]his testimony was contradicted by" other evidence, *id.*, and made findings of fact that these policies and instructions "were not mistakes or aberrations, but documented the approach American Family wanted their managers to take when managing agents." *Id.*, PageID20983.

### C. It is the right to control, not its exercise, that determines an employee relationship.

American Family's argument about the alleged conflict between the Rider and Diemer trial testimony is a rhetorical sleight of hand that erroneously presumes that Plaintiffs must prove that American Family asserted actual control over every single agent. *Darden* is clear that the common-law test focuses on "the hiring party's *right* to control," not actual control. *Darden*, 503 U.S. at 323 (emphasis added). This Court has held that "[i]t is the right to control, not its exercise, that determines an employee relationship." *Cement Transp., Inc.*, 490 F.2d at 1027. Thus, "'[t]he absence of need to control should not be confused with the absence of right to control," because "[t]he right to control contemplated by … the common law as an incident of employment requires only such supervision as the nature of the work requires." *Peno Trucking*, 296 F. App'x at 456 (quoted case omitted). As one treatise states, the "[r]ight to control does not need to be exercised," and "[w]orkers with high levels of discretion can be considered employees as long as

the employer has the discretion to direct their behavior." Robert Wood, LEGAL GUIDE TO INDEPENDENT CONTRACTOR STATUS, 4-5 (Tax Institute, 2010).

The district court found that American Family retained the right to control the agents and regularly exercised this right to control as needed to drive agent production and achieve the Company's own sales goals. R.320, Findings, PageID20982-85. That American Family hand-picked one agent (Diemer) to testify that she did not feel controlled does not disprove American Family's right to control or outweigh the overwhelming evidence and findings of fact otherwise. *Peno Trucking*, 296 F. App'x at 456. Indeed, it is telling that out of the 7,000 plus class members – both current and former agents – who received direct notice, only eleven chose to opt out. R.321, Order, PageID20988-89. Diemer is not one of them.

## CONCLUSION

American Family cannot avoid complying with ERISA by describing its agents as independent contractors in a contract but then retaining the right to control the manner and means of their service in reality. The district court's opinion that American Family's conduct is an outlier that makes the agents employees under ERISA is the correct one. The Court should affirm the district court's order and remand the case for further proceedings.

Respectfully submitted,

*/s/ Charles J. Crueger*
Charles J. Crueger
Erin K. Dickinson
Crueger Dickinson LLC
4532 N. Oakland Ave.
Whitefish Bay, WI 53211
T. (414) 210-3900
E. cjc@cruegerdickinson.com
E. ekd@cruegerdickinson.com

Edward A. Wallace
Kara A. Elgersma
Wexler Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
T. (312) 346-2222
E. kae@wexlerwallace.com
E. eaw@wexlerwallace.com

Drew T. Legando
Landskroner Grieco Merriman, LLC
1360 West Ninth Street, Suite 200
Cleveland, OH 44113
T. (216) 522-9000
E. drew@lgmlegal.com

Gregory F. Coleman
Greg Coleman Law PC
First Tennessee Plaza
800 South Gay Street, Suite 1100
Knoxville, TN 37929
T. (865) 247-0080
E. greg@gregcolemanlaw.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), contains 12,978 including the text boxes on pages 10, 16, 17 and 19. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated: March 9, 2018

*/s/ Charles J. Crueger*
Charles J. Crueger
One of the Attorneys for
Plaintiffs-Appellees

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 9, 2018, an electronic copy of the Brief of Plaintiffs-Appellees Walid Jammal, Kathleen Tuersley, Cinda J. Durachinsky and Nathan Garrett was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.

*/s/ Charles J. Crueger*
Charles J. Crueger

**PLAINTIFFS/APPELLEES' DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

Pursuant to 6. Cir. R. 30(b), Plaintiffs/Appellees hereby designate the following filings in the district court's electronic record to be relevant documents for purposes of this appeal:

| DESCRIPTION OF ENTRY | DATE FILED | RECORD NO. |
|---|---|---|
| Memorandum and Order Denying Motion to Dismiss | August 9, 2013 | R. 42<br>PageID# 1524-38 |
| Second Amended Complaint | June 30, 2014 | R. 67<br>PageID# 3076-80 |
| Opinion and Order Granting-in-Part and Denying-in-Part Motions for Summary Judgment | April 21, 2015 | R.114<br>PageID# 10172-95 |
| Memorandum and Order Denying Motion for Partial Summary Judgment | January 14, 2016 | R. 132<br>PageID# 12275-84 |
| Memorandum and Oder Granting Class Certification | March 2, 2016 | R. 137<br>PageID# 12477-89 |
| Trial Transcript, Volume 2, April 3, 2017 | May 5, 2017 | R. 304<br>PageID# 18630 |
| Trial Transcript, Volume 3, April 4, 2017 | May 5, 2017 | R. 305<br>PageID# 18706-902 |
| Trial Transcript, Volume 4, April 5, 2017 | May 5, 2017 | R. 306<br>PageID# 18981-19166 |
| Trial Transcript, Volume 5, April 7, 2017 | May 5, 2017 | R. 307<br>PageID# 19206-398 |
| Trial Transcript, Volume 6, April 10, 2017 | May 5, 2017 | R. 308<br>PageID# 19412-19435 |
| Trial Transcript, Volume 7, April 11, 2017 | May 5, 2017 | R. 309<br>PageID# 19686-862 |
| Trial Transcript, Volume 8, April 12, 2017 | May 5, 2017 | R. 310<br>PageID# 20109 |
| Trial Transcript, Volume 10, April 14, 2017 | May 5, 2017 | R. 312<br>PageID# 20573-78 |
| Trial Memorandum and Opinion | August 1, 2017 | R. 320 |

| DESCRIPTION OF ENTRY | DATE FILED | RECORD NO. |
|---|---|---|
| | | PageID# 20946-86 |
| Memorandum and Order Denying Motion to Decertify | August 1, 2017 | R. 321 PageID# 20988-89 |
| Joint Trial Exhibit 1- 1993 American Family Agent Agreement | January 18, 2018 | R. 326-1 PageID# 25035 |
| Plaintiffs' Trial Exhibit 13- Template Written Reminder Performance Improvement Process | January 18, 2018 | R. 326-7 PageID# 21185 |
| Plaintiffs' Trial Exhibit 14- Template Written Notice Performance Improvement Process | January 18, 2018 | R. 326-8 PageID# 21186 |
| Plaintiffs' Trial Exhibit 16- American Family Transition to Management Participant Guide | January 18, 2018 | R. 326-10 PageID# 21358-683 |
| Plaintiffs' Trial Exhibit 56- Template Daily Activity Report | January 18, 2018 | R. 327-4 PageID# 21814-15 |
| Plaintiffs' Trial Exhibit 189- Email from TARGET_INVEST to ALL-DXS-SL re: November TAC training to use with your ASM team | January 18, 2018 | R. 327-17 PageID# 21886-87 |
| Plaintiffs' Trial Exhibit 190- Targeted Agency Consultation DX Team Huddle- Strategic Coaching: Compare Perceptions, Consider/Remove Obstacles Leader's Guide | January 18, 2018 | R. 327-18 PageID# 21888-905 |
| Plaintiffs' Trial Exhibit 203- Email from Duran to Meyer re: FW: Washington Life Approaches by District w/ attachment | January 18, 2018 | R. 327-29 PageID# 21931-37 |

| DESCRIPTION OF ENTRY | DATE FILED | RECORD NO. |
|---|---|---|
| Plaintiffs' Trial Exhibit 328- ASM Performance Expectations Year to Date 8/31/12 | January 18, 2018 | R. 328-4 PageID# 22350 |
| Plaintiffs' Trial Exhibit 373- Email from Padgett to Nelson re: FW: Information for JP Fry | January 18, 2018 | R. 329-5 PageID# 23134 |
| Plaintiffs' Trial Exhibit 382- Nov. 2-4, 2010 Results Week Meeting, Quarterly Financial and Growth Update | January 18, 2018 | R. 329-9 PageID# 23164 |
| Plaintiffs' Trial Exhibit 383- Performance Improvement Process | January 18, 2018 | R. 329-10 PageID# 23166-99 |
| Plaintiffs' Trial Exhibit 388- Performance Improvement Process Overview | January 18, 2018 | R. 329-13 PageID# 23206-07 |
| Plaintiffs' Trial Exhibit 414- American Family The World-Class Agency Sales Manager: Developing Self and Staff PowerPoint | January 18, 2018 | R. 329-20 PageID# 23434 |
| Plaintiffs' Trial Exhibit 422- American Family Contingent Labor Guideline for Managers | January 18, 2018 | R. 329-22 PageID# 23478-90 |
| Plaintiffs' Trial Exhibit 519- American Family District Managers Manual | January 18, 2018 | R. 330-1 PageID# 23638 |
| Plaintiffs' Trial Exhibit 521- American Family Communicating Up and Down Channels for Strong Sales Leadership Leader's Guide and Participant Guide | January 18, 2018 | R. 330-3 PageID# 24135 |
| Plaintiffs' Trial Exhibit 530- 2013 Agency Sales Manager Performance Bonus | January 18, 2018 | R. 331-3 PageID# 24577 |

| DESCRIPTION OF ENTRY | DATE FILED | RECORD NO. |
|---|---|---|
| Plaintiffs' Trial Exhibit 532-American Family Agent and Agent Staff Code of Conduct & Business Ethics | January 18, 2018 | R. 332-2<br>PageID# 24596-600 |
| Plaintiffs' Trial Exhibit 543-American Family The World-Class Agency Sales Manager: Developing Self and Staff Participant Guide | January 18, 2018 | R. 332-7<br>PageID# 24626-67 |
| Plaintiffs' Trial Exhibit 555-Letter from Timothy C. Frautschi to Kathy Sibbald re: TAM issued to American Family in 1973 | January 18, 2018 | R. 332-11<br>PageID# 24794 |
| Plaintiffs' Trial Exhibit 750-1973 IRS TAM | January 18, 2018 | R. 332-18<br>PageID# 24834 |