**No. 17-4125**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

WALID JAMMAL; KATHLEEN TUERSLEY; CINDA J. DURACHINSKY; NATHAN GARRETT,
*Plaintiffs-Appellees,*

vs.

AMERICAN FAMILY INSURANCE COMPANY, ET AL.
*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio
Case No. 1:13-cv-00437
(Hon. Donald C. Nugent)

**AMICUS CURIAE BRIEF OF PUBLIC JUSTICE IN SUPPORT OF PLAINTIFFS-APPELLEES**

Seth R. Lesser
KLAFTER OLSEN & LESSER LLP
2 International Drive, Ste. 350
Rye Brook, NY 10573
(914) 934-9200

Karla Gilbride
PUBLIC JUSTICE, P.C.
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure and 6 Cir. R. 26.1, *amicus curiae* Public Justice makes the following disclosures:

1. Is said amicus curiae a subsidiary or affiliate of a publicly-owned corporation?

No.

2. Is there a publicly-owned corporation, not a party to the appeal, which has a financial interest in the outcome?

No.

Dated: March 16, 2018

/s/ Seth R. Lesser

Counsel for *Amicus Curiae* Public Justice

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS ..................................................................................... ii

STATEMENT OF PARTY CONSENT ..................................................................1

INTEREST OF *AMICUS CURIAE* .......................................................................1

INTRODUCTION ..............................................................................................2

ARGUMENT .....................................................................................................6

I. The Chamber's Narrative Creates a False Choice Between Independence and Employee Protections that Ignores the Massive Financial Incentives Corporations Have to Misclassify Their Workers. ...........................................................6

A. Flexible Work Arrangements Are Not the Sole Province of Independent Contracting. ............................................................................................7

B. Mislabeling Workers as Independent Contractors Immunizes Employers from Liability for Workplace Injuries and Harassment, While Depriving States and the Federal Government of Billions of Dollars in Revenue and Disadvantaging Responsible Employers. .....................................................10

C. Plaintiffs and Class Members, Like Other Misclassified Workers, Received Neither Autonomy and Independence Nor the Legal Protections of employee Status: They Experienced the Worst of Both Worlds, and the Terms of Their Contracts Were Properly discounted. ................................15

II. The District Court Relied on a Full Evidentiary Record After discovery and Trial to Reach Its Finding of Classwide Liability Against American family. .........20

CONCLUSION ..................................................................................................24

CERTIFICATE OF SERVICE ...........................................................................2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1945)....................5, 20, 21, 23

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989)....................11

*Craig v. FedEx Ground Package System, Inc.*,
335 P.3d 66 (Kan. 2014)....................18, 19

*Estrada v. FedEx Ground Package System, Inc.*,
154 Cal.App.4th 1 (2007)....................18, 19

*FedEx Home Delivery v. NLRB*,
563 F.3d 492 (D.C. Cir. 2009)....................18, 19

*Monroe v. FTS USA, LLC*,
860 F.3d 389 (6th Cir. 2017)....................*passim*

*Nationwide Mutual Ins. Co. v. Darden*,
503 U.S. 318 (1992)....................16, 19, 22

*Slayman v. FedEx Ground Package System, Inc.*,
765 F.3d 1033 (9th Cir. 2014)....................18, 19

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)....................*passim*

**Statutes**

1986 Immigration Reform and Control Act....................13

Employee Retirement Income Security Act....................5, 22

Fair Labor Standards Act....................passim

National Labor Relations Act....................10, 19

**Other Authorities**

Annemarie Mann and Amy Adkins, America's Coming Workplace: Home Alone, Business Journal (March 2017), available at http://news.gallup.com/businessjournal/206033/america-coming-workplace-home-alone.aspx ....................8

Catherine Ruckelshaus and Ceilidh Gao, Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries (Sept. 2017), available at www.nelp.org/content/uploads/NELP-independent-contractors-cost-2017.pdf ....................12

Christopher Buscagli, Crafting a Legislative Solution to the Economic Harm of Employee Misclassification, 9 U.C. Davis Bus. L.J. 111 (spring 2009) ....................13

Diana Farrell and Fiona Greig, Paychecks, Paydays, and the Online Platform Economy: Big Data on Income Volatility (Feb. 2016), available at https://www.jpmorganchase.com/corporate/institute/report-paychecks-paydays-and-the-online-platform-economy.htm ....................14

Erin Johansson, Fed Up with FedEx: How FedEx Ground Tramples Workers' Rights and Civil Rights (Oct. 2007), available at http://www.americanrightsatwork.org/dmdocuments/ARAWReports/fedupwithfedex.pdf ....................17

Executive Office of the President Council of Economic Affairs, Work-Life Balance and the Economics of Workplace Flexibility (2010), available at vailable at ttp://digitalcommons.ilr.cornell.edu/key_workplace/714 ....................7

Families and Work Institute, 2009 Guide to Bold New Ideas for Making Work Work, available at www.familiesandwork.org/site/research/reports/2009boldideas.pdf ....................8

Federal Rule of Civil Procedure 23 ....................*passim*

Federal Rule of Civil Procedure 30(b)(6) ....................23

Françoise Carré, Economic Policy Institute Briefing Paper #403 (June 2015), available at http://www.epi.org/publication/independent-contractor-misclassification/ ....................12

Investigation in Arizona and Utah Secures Wages and Benefits, https://www.dol.gov/newsroom/releases/whd/whd20150518 ....................16

Lalith De Silva, et al., Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs, Planmatics, Inc., Prepared for the US Department of Labor Employment and Training Administration (2000), available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf ....................10

Lawrence F. Katz & Alan B. Krueger, The Rise and Nature of Alternative Work Arrangements in the United States, 1995-2015, National Bureau of Economic Research (Sept. 2016), available at http://www.nber.org/papers/w22667 (last visited March 16, 2018)....................14

Nicholas Bloom, et al., Does Working from Home Work?: Evidence from a Chinese Experiment, Quarterly Journal of Economics (2015), available at https://people.stanford.edu/nbloom/sites/default/files/wfh.pdf ....................9

U.S. Dep't of Labor, Bureau of Labor Statistics, Workers on Flexible and Shift Schedules in 2004, available at https://www.bls.gov/news.release/flex.nr0.htm ....................7

U.S. Government Accountability Office, Contingent Workforce: Size, Characteristics, Earnings, and Benefits (April 2015), available at http://www.gao.gov/assets/670/669766.pdf ....................15

U.S. Government Accountability Office, Employee Misclassification: Improved Coordination, Outreach, and Targeting Could Better Ensure Detection and Prevention (August 2009), available at http://www.gao.gov/assets/300/293679.pdf ....................11

Work from Home for Xerox, https://www.xerox.com/en-us/jobs/work-from-home ....................9

## STATEMENT OF PARTY CONSENT

All parties have consented to the filing of this brief on behalf of the *amicus curiae*.

## INTEREST OF *AMICUS CURIAE*[1]

Public Justice is a national public interest law firm that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting corporate and governmental misconduct. The organization maintains a Workers' Rights Project, through which its attorneys represent low-wage workers facing barriers to their ability to defend their statutory and common law employment rights through the civil justice system.

Public Justice's efforts on behalf of workers have often involved combatting mandatory arbitration provisions and class and collective action bans that limit workers' ability to band together to seek redress for workplace discrimination, non-payment of wages and other abuses. Increasingly, however, the Workers' Rights Project has also assisted workers who have been declared ineligible for those legal protections because their employers have misclassified them as independent contractors. Public Justice has represented misclassified workers in the port trucking and other industries, and through that representation has come to

[1] No party's counsel authored this brief in whole or in part. Nor did any party, party's counsel, or other person (other than *Amicus*, its members, or its counsel) contribute money intended to fund the preparation or submission of this brief.

understand how much harm is caused—to workers, to responsible employers, and to social safety nets—by deliberate independent contractor misclassification. *Amicus* thus has a strong interest in ensuring that employers are not permitted to hide behind carefully crafted contract language to avoid legal responsibility to, and for, those they employ.

## INTRODUCTION

In its brief supporting the appellants, the Chamber of Commerce of the United States of America ("the Chamber") makes two arguments that rest upon fundamentally flawed premises: about the facts of this case; about broader economic conditions; and about the state of the law. These mismatches between rhetoric and reality should not go unaddressed.

First, with the piety of a fox guarding the chicken coop, the Chamber expresses great solicitude for workers labeled as "independent contractors" by corporate employers like American Family. The Chamber argues, in a general fashion, that workers prefer independent contractor arrangements to employee status because the former supposedly affords greater flexibility and autonomy. And it warns this Court ominously, and repeatedly, that allowing the district court's opinion to stand will disturb these arrangements by injecting uncertainty into the test for distinguishing employees from independent contractors. This argument proves far too much; the same charge of injecting uncertainty can be made against

any case that questions whether any worker is correctly classified as an independent contractor, because every such case – by being a new application of law to facts – will have to reach new legal conclusions based on the facts in that case. Essentially, the Chamber is arguing that courts should rubber-stamp whatever labels businesses want to give their workers, without scrutinizing the details of their working relationships, because anything more than a rubber stamp would "undermine the predictability essential to the companies and workers that choose independent contracting." Chamber Brief at 8. But such an abdication of responsibility is not what the law requires.

Moreover, the Chamber's oversimplified depiction of the economic landscape ignores the fact that many workers classified as employees, such as Plaintiffs' own managers at American Family, already enjoy flexibility and autonomy in their jobs along with the legal rights and protections that come with employee status. See R.320. Technology affords many employees more flexibility regarding when and where they work, but those benefits can be enjoyed by employees without converting them into independent contractors. And the existence of that technology does not change the fundamentals of the economic relationship between employer and employee. Meanwhile Plaintiffs and members of the certified class, wrongly classified as independent contractors for American Family's financial gain, enjoyed neither flexibility nor legal protections.

True independent contract jobs certainly exist, and while plaintiffs may win some misclassification cases, so, too, do defendant employers. Clear rules for differentiating employees from true independent contractors are obviously important, as the Chamber acknowledges, Chamber Brief at 2, but they are needed specifically to prevent employers like American Family from labelling workers as "independent contractors" while retaining effective control over their working lives. The district court faithfully applied those rules to the facts of this case and reached the correct conclusion.

Second, the Chamber notes that this case was certified as a class action under Rule 23, not a collective action under the Fair Labor Standards Act ("FLSA"). It tries to imbue this undisputed fact with legal significance by arguing that the "Use of Representative Testimony [by the court below] Was Not Authorized by this Court's Case Law," particularly this Court's decision in *Monroe v. FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017). Chamber Brief at 15. But the Chamber conflates and confuses several points here. The Chamber's contention appears to be that by allowing testimony from various employees, the district court impermissibly used "representative testimony" in a Rule 23 class action and that even if such testimony is proper in an FLSA case like *Monroe*, it should not have been allowed under the higher standards of Rule 23. Chamber Brief at 16-18. But, as the Supreme Court made clear in *Tyson Foods, Inc. v.*

*Bouaphakeo*, 136 S. Ct. 1036 (2016), there is no categorical prohibition on the use of "representative discovery" in Rule 23 classes – indeed, *Tyson* recognized the contrary, namely that such evidence can be used in individual as well as class actions. Nor did the district court – as the Chamber would have it – apply an improper FLSA-specific representative testimony inference derived from *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680 (1945). That *Mt Clemens* inference goes to determining hours worked when a company failed to keep time records, as the Supreme Court recognized in *Tyson*. But that inference has nothing to do with this case and this appeal for the simple reason that the district court did not apply it.

Thus, the Chamber's discussion of *Monroe* and *Mt. Clemens,* and the differences between FLSA and Rule 23 cases, is a red herring. The only issue currently on appeal to this Court is whether the members of the certified class were wrongly classified as independent contractors under ERISA. The district court reached its finding of employee status based on the totality of the record – the many exhibits, the corporate documents, the days of testimony by both class members and the corporate witnesses. Class actions are by definition representative actions, but beyond that truism and the unremarkable fact that not every member of the class testified at trial, there was nothing "representative," much less untoward, about the evidence upon which the district court relied in finding that American Family violated the law.

# ARGUMENT

## I. The Chamber's Narrative Creates a False Choice Between Independence and Employee Protections that Ignores the Massive Financial Incentives Corporations Have to Misclassify Their Workers.

The Chamber suggests that many workers are "drawn to" the independent contractor lifestyle because it affords them greater flexibility and autonomy, such as the "ability to choose [their] own hours, clients and the manner in which the work is completed." Chamber Brief at 5. Describing these and other supposed "advantages not available in employment relationships," *id.* at 7, the Chamber suggests a tradeoff—not appropriate for everyone, but a rational choice for those "MacBook-toting millennials" and other entrepreneurial types who willingly sacrifice the "stability" of "traditional" employment for flexible schedules and the ability to "take control over their economic destiny." *Id.* at 5, 7.

There are several things wrong with this picture. First, as a general matter, it undervalues the amount of flexibility available to "traditional" employees. Second, also as a general matter and as a matter of the current work world, it ignores the strong incentives that employers have to mislabel their workers as independent contractors, and the consequences of such mislabeling upon the workers, other employers, and the social safety net. Finally, and perhaps most importantly, the Chamber's picture has little to nothing to do with the experiences of the American Family insurance agents that comprise the class in this case, who lacked the

flexibility and autonomy of true independent contractors and indeed had less flexibility and autonomy than many employees.

**A. Flexible Work Arrangements Are Not the Sole Province of Independent Contracting.**

The Chamber posits that an independent contractor, "unlike an employee," enjoys the ability to choose his or her own hours. Chamber Brief at 5. But millions of American employees enjoy that ability, at least to some degree, including wage and salaried workers. In 2004, 27.5% of full-time wage and salary employees, or over 27 million people, reported having flexible schedules that allowed them to vary the time they began or ended work. U.S. Dep't of Labor, Bureau of Labor Statistics, Workers on Flexible and Shift Schedules in 2004, available at https://www.bls.gov/news.release/flex.nr0.htm (last visited March 13, 2018).

While such schedules were most common for management and professional employees, *id.*, arrangements like shift swapping and job sharing have led to enhanced flexibility for manufacturing employees as well. A good example would be the shift swapping and job sharing instituted at Kraft Foods plants in 2002. *See* Executive Office of the President Council of Economic Affairs, Work-Life Balance and the Economics of Workplace Flexibility (2010), at 15 (hereafter, "Workplace Flexibility"), available at http://digitalcommons.ilr.cornell.edu/key_workplace/714 (last visited March 13,

2018). Likewise, in 2009, Alston & Bird LLP, an Atlanta law firm, began offering compressed workweek schedules of 75 hours over eight or nine days, with increased days off, to its non-exempt employees as well as its lawyers. Families and Work Institute, 2009 Guide to Bold New Ideas for Making Work Work, at 8, available at www.familiesandwork.org/site/research/reports/2009boldideas.pdf (last visited March 13, 2018).

Nor are flexible work schedules offered only by larger employers. To the contrary, a nationwide survey of 1100 employers conducted in 2008 found that firms employing between 50 and 99 employees offered as much or more flexibility than firms employing over 1000 workers. Workplace Flexibility at 14. For example, the Detroit Regional Chamber of Commerce reported in 2010 that 10% to 15% of its employees worked a flexible schedule that involved coming in and leaving earlier than regular business hours, while other employees enjoyed different flexible options such as shorter lunch breaks in exchange for leaving early, telecommuting, and part-year schedules. *Id.* at 18.

Technological advances that enable more jobs to be done remotely have led to a surge in telecommuting arrangements, with 43% of employed respondents to a 2016 Gallup poll reporting that they spent at least some time working in a different location from their coworkers, and 31% saying that they worked remotely 80% or more of the time. Annemarie Mann and Amy Adkins, America's Coming

Workplace: Home Alone, Business Journal (March 2017), available at http://news.gallup.com/businessjournal/206033/america-coming-workplace-home-alone.aspx (last visited March 13, 2018). Xerox advertises that over 8000 of its employees currently work from home, including a Heroes at Home program geared towards veterans and military spouses. Work from Home for Xerox, https://www.xerox.com/en-us/jobs/work-from-home (last visited March 13, 2018).

Contrary to concerns that remote employees will not actually work diligently, a 2014 experiment comparing call center workers for a Chinese travel agency who were randomly assigned to work from home to those who continued to work in the office found the virtual employees to be more productive, and more satisfied with their jobs, than those who commuted into the office each day. Indeed, the results were so positive that the employer decided to offer the work-from-home option to all its employees. Nicholas Bloom, et al., Does Working from Home Work?: Evidence from a Chinese Experiment, Quarterly Journal of Economics (2015), available at https://people.stanford.edu/nbloom/sites/default/files/wfh.pdf (last visited March 13, 2018).

Thus, the Chamber offers a false choice: workers don't have to accept independent contractor status in exchange for flexibility in when and where they

work. Growing flexibility is indeed a hallmark of the modern workforce, but this is just as true for workers classified as employees as for other types of workers.

### B. Mislabeling Workers as Independent Contractors Immunizes Employers from Liability for Workplace Injuries and Harassment, While Depriving States and the Federal Government of Billions of Dollars in Revenue and Disadvantaging Responsible Employers.

The Chamber's one-sided picture not only exaggerates the exclusive link between independent contracting and flexibility; it also downplays the many protections and rights that independent contractors lack, gently suggesting that "[e]mployees may be entitled to certain legal benefits unavailable to independent contractors." Chamber Brief at 8. That list of benefits is long. Independent contractors are not covered by minimum wage or overtime requirements under the FLSA or most state wage laws, are not entitled to workers compensation if injured on the job or unemployment insurance if terminated, may not sue their supervisors for sexual harassment or other forms of discrimination, must pay both the employer and employee portion of FICA (Social Security and Medicare) tax, and do not have the right to join with other workers and engage in collective bargaining under the National Labor Relations Act. As one observer put it, this portion of the workforce "is actually working under the labor conditions of the 1890's." Lalith De Silva, et al., Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs, Planmatics, Inc., Prepared for the US

Department of Labor Employment and Training Administration (2000), available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf (last visited March 13, 2018).

When individuals are truly selling their technical expertise or artistic talents to different clients on short-term projects, like the sculptor who created the statue in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989), the independent contractor label is appropriate, because it accurately reflects an arms-length business transaction between two business entities. However, employers have powerful incentives to clothe their employees in the trappings of independence in order to apply the label even when it does not fit.

Many of these incentives are financial, inasmuch as every worker labeled as an independent contractor is one for whom the employer can avoid paying payroll taxes or contributing to the state workers compensation or unemployment insurance trust funds, let alone paying for health insurance or overtime. When the IRS last comprehensively studied the problem over 30 years ago, it found that 15% of employers misclassified 3.4 million workers as independent contractors, resulting in a loss of $1.6 billion in revenue to the federal government in 1984 dollars. U.S. Government Accountability Office, Employee Misclassification: Improved Coordination, Outreach, and Targeting Could Better Ensure Detection and Prevention (August 2009), available at http://www.gao.gov/assets/300/293679.pdf (last visited March 13, 2018).

State-level audits have found similarly extensive, and expensive, rates of misclassification. For example, a study of 2003-2004 audit data from Michigan found that 30% of employers misclassified at least some of their workers, and 24% of those working for these employers were misclassified. Françoise Carré, Economic Policy Institute Briefing Paper #403 (June 2015), at 9 (hereafter EPI), available at http://www.epi.org/publication/independent-contractor-misclassification/ (last visited March 16, 2018). Meanwhile a Tennessee task force found that only 50% of trucking companies and 12% of construction companies consistently classified their workers as employees for both workers compensation and unemployment insurance purposes. A 2009 study in Ohio extrapolating from audit results estimated the total number of misclassified workers at between 54,000 and 459,000 each year, and found that the state lost between $12 million and $100 million in unemployment compensation payments, between $60 million and $510 million in workers compensation premiums and between $21 million and $248 million in income tax revenues. Catherine Ruckelshaus and Ceilidh Gao, Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries (Sept. 2017) (hereafter Misclassification Costs), available at www.nelp.org/content/uploads/NELP-independent-contractors-cost-2017.pdf (last visited March 13, 2018).

Other incentives for employers to misclassify their workers involve evading potential liability, whether for on-the-job injuries or for claims of racial, gender, age, or disability discrimination. Those who hire independent contractors also need not comply with the 1986 Immigration Reform and Control Act, which forbids employers from knowingly hiring undocumented immigrants and requires them to verify immigration status.

Employers who correctly classify their workers are often underbid on contracts by their less responsible competitors with lower labor costs. A Minnesota auditor's report found that an employer in the drywall trade who classified its workers as employees paid a 26% higher hourly rate after factoring in federal and state tax payments, unemployment and workers compensation insurance premiums than an employer who classified the same worker as an independent contractor. Christopher Buscagli, Crafting a Legislative Solution to the Economic Harm of Employee Misclassification, 9 U.C. Davis Bus. L.J. 111 (spring 2009). And while the misclassifying employer receives the entire windfall for that pay disparity, the negative externalities are shared among the non-misclassifying employers in the same industry, the federal and state governments deprived of revenue, and the misclassified workers, who receive demonstrably less take-home pay. *See* Misclassification Costs at n.62 (calculating that a construction worker earning $31,200 a year before taxes would be left with annual net compensation of

$10,660.80 if paid as an independent contractor, compared to $21,885.20 if paid properly as an employee).

These competitive pressures have led to a host of new arrangements through which employers can insulate themselves from financial and legal responsibility for the people that work for them: in addition to misclassifying their own employees as independent contractors, employers are increasingly contracting with staffing agencies or other companies to hire workers for them, the sort of employment arrangement experienced by the cable installers in the *Monroe v. FTS USA case that* this Court recently heard. Indeed, a survey conducted as part of the Rand American Life Panel in 2015 found that all the growth in the U.S. economy between 2005 and 2015 occurred in alternative work arrangements, defined to include temporary staffing agency workers, on-call workers, contract workers, and independent contractors or freelancers. Lawrence F. Katz & Alan B. Krueger, The Rise and Nature of Alternative Work Arrangements in the United States, 1995-2015, National Bureau of Economic Research (Sept. 2016), available at http://www.nber.org/papers/w22667 (last visited March 16, 2018).

This rapid growth in alternative work arrangements has coincided with growing income inequality, and income volatility. For instance, one study of a million Chase accountholders between 2012 and 2015 found that 55% experienced income fluctuation of more than 30% from month to month. Diana Farrell and

Fiona Greig, Paychecks, Paydays, and the Online Platform Economy: Big Data on Income Volatility (Feb. 2016), available at https://www.jpmorganchase.com/corporate/institute/report-paychecks-paydays-and-the-online-platform-economy.htm (last visited March 16, 2018). Perhaps this is more than a coincidence. In contrast to the Chamber's account of "highly motivated" contractors earning more money than "regular employees," Chamber Brief at 5, a 2015 report found that contingent workers, a category including independent contractors as well as on-call workers, temps and contract employees, earned less on an hourly, weekly and yearly basis than full-time employees, were more likely to report living in poverty, and were more likely to receive public assistance. U.S. Government Accountability Office, Contingent Workforce: Size, Characteristics, Earnings, and Benefits (April 2015), available at http://www.gao.gov/assets/670/669766.pdf (last visited March 13, 2018).

### C. Plaintiffs and Class Members, Like Other Misclassified Workers, Received Neither Autonomy and Independence Nor the Legal Protections of employee Status: They Experienced the Worst of Both Worlds, and the Terms of Their Contracts Were Properly discounted.

American Family and the Chamber both opine that the district court gave insufficient weight to the contract labeling American Family agents as independent contractors. Appellant Brief at 19-21; Chamber Brief at 10-11. But there is a good reason that the parties' contract is only one element in the multi-factor test of

*Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992): its terms are easily manipulable by the party with greater bargaining strength, the employer, and often do not reflect the day-to-day reality of the working relationship. That was the case here.

A federal enforcement action against several construction firms in Utah and Arizona demonstrates this point. The workers were building homes one day as employees, but when they returned to the same job sites the next day to do the same work, they were required to sign contracts naming themselves as owner/members of limited liability companies so that the firms in control of their work could relabel them independent contractors. This surface-level reclassification did not hold up; the construction companies were investigated by the state of Utah and the U.S. Department of Labor, leading to litigation and a consent judgment awarding back pay and liquidated damages to the workers. Investigation in Arizona and Utah Secures Wages and Benefits, https://www.dol.gov/newsroom/releases/whd/whd20150518 (last visited March 13, 2018).

Drivers for FedEx Ground had a different experience from the Utah construction workers in that they were told from the beginning that they would be independent contractors. And as the Chamber suggested in its brief, many of them were attracted to the notion of being their own boss, a phrase FedEx used verbatim

in its advertisements. Erin Johansson, Fed Up with FedEx: How FedEx Ground Tramples Workers' Rights and Civil Rights (Oct. 2007), available at http://www.americanrightsatwork.org/dmdocuments/ARAWReports/fedupwithfedex.pdf (last visited January 13, 2018). But FedEx ground's 15000 drivers soon learned that the work arrangements were not as advertised: instead of deciding for themselves when and where to work, each driver was assigned a service area and required to deliver all packages assigned to them in that area. *Id.* FedEx also dictated the terms of their compensation and could reassign them to different routes at its sole discretion. *Id.* Delivering all of the assigned packages on a route often necessitated working twelve-hour days or more, five days a week, without overtime. Finally, drivers were required to purchase their trucks and pay for maintenance, fuel and other expenses out of their earnings, such that some drivers' tax returns actually reflected a net loss after all expenses were deducted. This led one disenchanted FedEx Ground driver to describe the working arrangement as "a modern-day sweatshop," except that "the old sweatshops were better because you didn't have to buy the sweatshop. We have to buy our own sweatshop." *Id.*[2]

[2] Truck drivers working for other companies besides FedEx are also frequently required to lease or purchase their trucks from their employers, and to have the costs of operating those trucks deducted from their pay, resulting in poverty-level wages despite working 60 or more hours per week. These drivers are also often prohibited from driving for other companies, another indication that they are not truly independent contractors despite being so classified. EPI at 11.

Several courts asked to sort out FedEx Ground's relationship with its workers have pointed to the language of the contracts FedEx drafted, but not to defer unquestioningly to that contractual language, as the Chamber and American Family suggest that courts should. Rather, those courts have criticized the contracts for trying to "elevate[] form over substance." *Craig v. FedEx Ground Package System, Inc.*, 335 P.3d 66, 81 (Kan. 2014) ("if a worker is hired like an employee, dressed like an employee, supervised like an employee, compensated like an employee, and terminated like an employee, words in an operating agreement cannot transform that worker's status into that of an independent contractor."). *See also Slayman v. FedEx Ground Package System, Inc.*, 765 F.3d 1033, 1042 (9th Cir. 2014) (concluding under Oregon's right to control test that the terms of FedEx's Operating Agreement, which contained a provision entitled "Discretion of Contractor to Determine Method and Means of Meeting Business Objectives," were "not dispositive as to whether an employer-employee relationship exists," and that as a matter of law the drivers were properly classified as employees); *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal.App.4th 1, 11 (2007) ("the evidence shows unequivocally that FedEx's conduct spoke louder than its words.").[3]

[3] The Chamber cites repeatedly to *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009), but that case applied a test focused on entrepreneurial

Like FedEx Ground's promises to its drivers, American Family's promises of autonomy and flexibility to its captive agents were illusory. American Family owned each agent's book of business and could reassign policies brought in by one agent to another agent, or require agents to service policies they did not initiate, without compensation. Appellees Brief at 7. American Family also required its agents to complete daily activity reports so that their managers could track how they spent their time. *Id.* at 19. Unlike employees of the Detroit Regional Chamber of Commerce and millions of other American workers classified as employees, American family agents were not allowed to work from home. *Id.* at 22. And unlike true independent contractors who can choose with whom they do business, Plaintiffs and class members could sell only American Family insurance products and were bound to a one-year nonsolicitation agreement after their work for American Family ended. *Id.* at 21.

American Family not only retained the right to control the manner and means of the agents' production, the key indicator of employee status under *Darden*; it exercised that right on numerous occasions. In the face of all of this

---

opportunities for profit and loss unique to the National Labor Relations Act, *id.* at 497, as opposed to the courts in *Craig*, *Slayman* and *Estrada*, all of which applied state law right-to-control tests much more analogous to *Darden*.

evidence, the district court was correct to give the terms of American Family's contract with its agents the weight they deserved—and no more.

## II. The District Court Relied on a Full Evidentiary Record After discovery and Trial to Reach Its Finding of Classwide Liability Against American family.

The Chamber's discussion of representative evidence, the FLSA and the Supreme Court's *Mt. Clemens* decision is both confused and entirely irrelevant to this case. For one thing, the district court's denial of American Family's motion to decertify the class is not properly part of this interlocutory appeal. Appellees Brief at 55. And to the extent that American Family's and the Chamber's arguments about representative evidence go to the classwide finding of employee status, they misstate the law on representative evidence as well as the type of evidence on which the district court relied.

First, as to the law: in no manner is representative testimony impermissible in a class action case. In fact, in *Tyson Foods* the Supreme Court explicitly held that representative evidence could be used in a Rule 23 class case and that there are no categorical rules about when it is permissible and when not, concluding its discussion of this type of evidence as follows:

> The Court reiterates that, while petitioner, respondents, or their respective amici may urge adoption of broad and categorical rules governing the use of representative and statistical evidence in class actions, this case provides no occasion to do so. Whether a

> representative sample may be used to establish classwide liability will depend on the purpose for which the sample is being introduced and on the underlying cause of action.

*Tyson Foods, Inc.*, 136 S. Ct. at 1049.

If the Chamber is trying to assert that relying on representative evidence—or, as relevant here, hearing testimony from some but not all class members at a class action trial—is impermissible when the underlying cause of action does not involve the FLSA, then the Chambers' position is at odds with *Tyson Foods*. Most assuredly, it cannot be improper in a Rule 23 class action for members of the class to testify— yet that seems to be the Chamber's view.

The Chamber then proceeds to a discussion about what is sometimes called the *Mt Clemens* inference in FLSA cases – the use of representative testimony to support an inference as to the number of hours worked when a company fails to keep time records. In *Tyson Foods*, the Supreme Court recognized that the *Mt. Clemens* burden-shifting framework is commonly applied in FLSA cases where evidentiary gaps are caused by the employer's poor recordkeeping. *Tyson Foods*, 136 S. Ct. at 1047.

But it is rather unclear why the Chamber brings up *Mt. Clemens*, or this Court's recent application of *Mt. Clemens* in *Monroe v. FTS USA, LLC*. *Mt. Clemens* and its progeny, including *Monroe*, involve calculating back pay for overtime and thus require the finder of fact to make determinations about the

number of hours each employee worked. *Monroe*, 860 F.3d at 404-05. Here, by contrast, the district court had no reason to determine how many hours any American Family agent worked, as the number of hours worked was simply not pertinent to the ERISA issues in this case (except inasmuch as American Family's ability to control when and for how long agents worked was one of many factors considered in the *Darden* right-to-control analysis). In other words, because of the nature of this case, the district court didn't have to use any representative testimony to reach an inference about hours worked because the district court didn't need to determine hours worked at all.[4]

More fundamentally, the Chamber's focus on representative evidence misstates what happened in this case. Unlike the plaintiffs in *Tyson Foods*, Plaintiffs here did not rely on statistical sampling and extrapolate the experiences

[4] The Chamber also suggests that "had Monroe been a Rule 23 case instead of a FLSA case, both certification and representative testimony would have been improper," Chamber Brief at 18, that statement is plainly wrong. The Court in *Monroe* noted the difference in proof standards between FLSA collective cases and Rule 23 class actions but did so to point out that what sufficed in a class action necessarily would suffice as well under the lower standard of an FLSA certification, explaining, "[t]he Supreme Court's ruling [in *Tyson Foods]* authorizing representative evidence under the standards of Rule 23 is therefore more than sufficient to cover FLSA collective actions under § 216." *Monroe*, 860 F.3d at 400. The Court did not state or even suggest that the FLSA plaintiffs' evidence in the case would not have supported Rule 23 class certification. Rather, the Court held that the totality of the evidence presented at trial supported FLSA collective certification, *id.* at 401 – just as it assuredly would have supported a Rule 23 certification.

of some workers to cover the class as a whole. *Tyson*, 136 S. Ct. at 1046. Rather, Plaintiffs deposed current and former American Family managers and presented that testimony at trial, along with testimony of American Family's Rule 30(b)(6) corporate designee and hundreds of pages of documentary evidence from American Family training manuals. Appellees Brief at 56. The district court reached its finding of classwide employee status, then, based on "good old-fashioned direct evidence," *Monroe*, 860 F.3d at 401. American Family and the Chamber obviously question the sufficiency of that evidence to support the district court's conclusion, but they cannot manufacture an error of law by describing the evidence as representative in the sense of *Mt. Clemens*, *Tyson* Foods or *Monroe*, when it was not.[5]

The only specific point of supposed error as to the class identified by American Family is the alleged conflict between the Rider and Diemer trial testimony, *see* Appellant Brief at 55. But beyond the fact that this supposed

[5] To the extent that American Family and the Chamber use the label "representative evidence" because fewer than all class members testified at trial, that constitutes the very purpose of a class action – the avoidance of the need for all similarly situated class members to try their cases separately and the ensuing burden on litigants and the judicial systems, as well as the possibility of inconsistent adjudications. Where individual issues exist in class actions, of course, the courts are fully aware of the many ways in which common issues can be differentiated from individual issues. *See generally* Manual for Complex Litigation, Fourth, § 21.5 (Fed. Judicial Center 2016).

conflict went to the actual exercise of control, not the right to control, and was thus legally irrelevant, *see* Appellees Brief at 57-58, a single snippet of testimony from a single witness cannot possibly lead to the conclusion that a class adjudication was improper.

The district court weighed the entirety of the evidence before it – twelve days of testimony and numerous exhibits – to reach its conclusion that Plaintiffs and class members should have been classified as employees. Distinctions between FLSA and Rule 23 are beside the point; classwide adjudication was proper and American Family's class-wide policy of misclassification was amply established through multiple sources of direct evidence. This case was not infected in any manner by misuse of so-called "representative testimony."

## CONCLUSION

The district court weighed the documentary and testimonial evidence presented by both parties during the twelve-day trial and, consistent with the unanimous decision of the advisory jury, concluded that American Family retained the right to control the manner and means by which its agents sold American Family-branded insurance. This is not an indictment of the insurance industry or independent contracting generally; it was an application of *Darden's* well-established common

law agency test to a fully developed factual record. The district court's conclusion was correct, and there is no reason for this Court to disturb it.

Dated: March 16, 2018

Respectfully submitted,

/s/ Seth R. Lesser

Seth R. Lesser
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, NY 10573
(914) 934-9200

Karla Gilbride
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington D.C. 20036
(202) 797-8600

Attorneys for *Amicus Curiae*
Public Justice

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(iii). It contains 5443 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2013 in Times New Roman 14-point font.

Dated: March 16, 2018 /s/ Seth R. Lesser

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on March 16, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the appellate CM/ECF system.

Dated: March 16, 2018

Public Justice, P.C.

s/ Seth R. Lesser

*Counsel for Amicus Curiae*